COBB, Judge.
The appellant, Jimmy Davis, Jr., an inmate on death row at Holman Correctional Facility, appeals the denial of his petition for postconviction relief filed pursuant to Rule 32, Ala.R.Crim.P. In 1993, Davis was convicted of murdering Johnny Hazle, a gas station attendant at a Direct Oil gasoline service station in Anniston, during the course of a robbery. The jury, by a vote of 11-1, recommended that Davis be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Davis to death. Davis appealed. On October 20, 1995, we remanded the case for the circuit court to enter a formal sentencing order. See Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995). On July 3, 1996, we again remanded the case for the circuit court to conduct a Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), hearing. See Davis v. State, 718 So.2d at 1153 (opinion on return to remand). On return to second remand, we affirmed Davis’s conviction and death sentence. See Davis v. State, 718 So.2d at 1153 (opinion on second return to remand). The Alabama Supreme Court affirmed our judgment and the United States Supreme Court denied certiorari review. Davis v. State, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999). We issued the certificate of judgment on September 15, 1998. See Rule 41, Ala.R.App.P.
In January 2000, Davis filed a timely Rule 32 petition in the Calhoun Circuit Court attacking his conviction and death sentence. Davis amended his petition in April 2000 and again in July 2001. An evidentiary hearing was held in August 2002. In August 2004, the circuit court issued a 63-page order denying Davis’s petition in part and dismissing it in part. This appeal followed.
The circuit court made the following detailed findings of fact in its order sentencing Daws to death:
“At approximately 7:16 p.m. on the evening of March 17, 1993, Anniston, *518 Alabama, Police Department Officer Brian Tumlin was dispatched to the Direct Oil gasoline station at the corner of 20th and Noble Streets in Anniston, Calhoun County, Alabama, in response to a report of a shooting inside the small service station building. The officer observed Dewey Waites kneeling over the victim, Johnny Hazel [sic]. He also noted three empty shell casings from spent bullets a short distance outside the service station door.
“The report dispatched to Officer Tumlin stated two black males were seen running west on 20th Street after shots were fired. One was reported wearing a black coat and/or a tan coat.
“Sgt. Rocky Stemen of the Anniston Police Department arrived to assist Officer Tumlin and placed three possible witnesses in patrol cars. Johnny Hazel was a 50 year old white male who had worked at the 18th and Noble Street Direct Oil Station as assistant manager for five or six years. He would often be visited by his friend Dewey Waites at the station where Hazel often worked alone. Waites testified that a black male with his face covered walked up to the station doorway at approximately 7:15 p.m., said ‘Give me your money,’ and then fired two shots from a silver or chrome plated automatic pistol at Johnny Hazel. Hazel slumped, then stepped to the phone and began calling the police, but he passed out and fell to the floor. Waites slammed the door shut, locked it and Waites then completed the call to the police. Anniston Rescue Squad personnel treated Hazel at the scene and then transported him to Northeast Alabama Regional Medical Center....
“Dr. Kenneth Elliott Warner, a State Medical Examiner, conducted an autopsy on Johnny Hazel. That examination revealed a gun shot wound to the right chest, as well as another to the left side of the back. Both projectiles passed through Hazel’s liver. Two metal projectiles were found, cleaned, sealed, and delivered to David Higgins in Birmingham. Dr. Warner opined that Johnny Hazel died as the result of multiple gun shots.
“Carla Lovell, a neighbor who resided on West 20th Street, heard gunshots on the night of March 17, 1993, and ran to her front porch and saw two men running to the west and called 911. She described the men as two black males with one of the males wearing a tan jacket with a bandanna around his head. She then went to the Direct Oil Station and later talked with the police. She thought the two were between 18 and 25 years of age. Mrs. Lovell’s mother-in-law, Betty Lovell, was in a house near her daughter-in-law. She heard two or three shots fired at or near the Direct Oil Service Station. She then saw two black males run around the corner of the station. She observed one of the males wore a light tan coat and that one wore either a bandanna or a hat turned backwards.... Betty Lovell testified that the two ran west on 20th Street past the Gurnee Avenue intersection and then turned south in the alley way in the next block past Gurnee. She went to the station and observed Mr. Dewey Waites and Mr. Hazel locked in the station. She was also later questioned by the police officers on the scene.
[[Image here]]
“Terrance Phillips, a 16-year-old black male, was charged in connection with the robbery and killing of Johnny Hazel. He pleaded guilty to conspiracy to commit robbery of the Direct Oil and received a ten-year sentence. At the time of this trial, he testified he had been released on bond and had applied *519 for probation. On March 17, 1993, Phillips attended high school and around 5:00 p.m., met the defendant, Jimmy Davis, and his cousin, Alphonso Phillips, at the Carver Recreation Center. The three males left Carver Center and walked to the Direct Oil Station at 20th and Noble Streets. He testified that Jimmy Davis possessed a chrome .25 caliber Raven [brand] pistol with a white handle. Davis stated ‘We’re going to hit Direct Gas Station’ or ‘We’re going to rob Direct Gas Station.’ Plans were discussed in the alley west of Gurnee Avenue. Phillips testified that Davis stated that ‘he had the gun and he was going to draw down on the man.’ Davis would point the gun at the station operator while Alphonso Phillips was to get the cash money. Terrance Phillips was to serve as a look-out. Terrance crossed the intersection of 20th and Noble Street to the North and proceeded up Noble Street as Alphonso Phillips and Jimmy Davis turned South on to the Direct Oil property. Terrance Phillips testified that he abandoned the criminal enterprise and continued walking north toward his house. After about a block’s walk he stated that he heard two or three gunshots; he continued walking to his house at 2307 Moore Avenue. He later left and walked to his grandmother’s home at 1711 Moore Avenue. There he encountered Jimmy Davis and Alphonso Phillips.
“Terrance Phillips stated [that] he asked Davis what had happened and that Davis said he told the attendant (Hazel) ‘Give it up, fuck-nigger’ and that the attendant smiled or laughed. He (Davis) shot him at least twice and then he (Davis) took off. Terrance Phillips testified that on that night he wore a black coat with a Los Angles Kings emblem on the back; that Alphonso Phillips wore a blue jeans jacket and that Jimmy Davis wore a pair of black cut-off jean shorts and a dark green shirt with a hood on it.” [1]

Standard, of Revieio

Davis appeals the denial of his petition for postconviction relief filed pursuant to Rule 32, Ala.R.Crim.P.
“A post-conviction petition is a collateral attack on a prior criminal conviction by which a defendant can assert that a conviction resulted from the substantial denial of his or her constitutional rights, and the purpose of a post-conviction proceeding is not to appeal the defendant’s underlying judgment, but rather to resolve allegations that constitutional violations occurred at trial, when those allegations have not been, and could not have been, adjudicated previously.”
People v. Coulter, 352 Ill.App.3d 151, 156, 287 Ill.Dec. 255, 260, 815 N.E.2d 899, 904 (2004).[2]
A Rule 32 petition “ ‘is treated procedurally as a cross between a civil and a criminal action; [it is] a new civil action ....’” Carroll v. State, 462 So.2d 789, 790 (Ala.Crim.App.1984). The burden of proof in a Rule 32 proceeding rests solely with the petitioner, not the State. According to Rule 32.3, Ala.R.Crim.P., “[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.”
*520 When this Court reviewed Davis’s capital-murder conviction and death sentence on direct appeal, we applied a “plain error” standard of review and evaluated the issues raised in Davis’s brief, whether or not they had been brought to the attention of the circuit court. See Rule 45A, Ala.R.App.P. However, the “plain error” standard of review does not apply to collateral proceedings attacking a death sentence. See Ex parte Dobyne, 805 So.2d 763 (Ala.2001); Brownlee v. State, 666 So.2d 91 (Ala.Crim.App.1995); Cade v. State, 629 So.2d 38 (Ala.Crim.App.1993); Thompson v. State, 615 So.2d 129 (Ala.Crim.App.1992). The United States Su preme Court in United States v. Frady, 456 U.S. 152, 164, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), stated:
“Because it was intended for use on direct appeal, ... the ‘plain error’ standard is out of place when a prisoner launches a collateral attack against a criminal conviction after society’s legitimate interest in the finality of the judgment has been perfected by the expiration of the time allowed for direct review or by the affirmance of the conviction on appeal.”
Other states have also declined to apply the plain-error standard of review to post-conviction proceedings. See People v. Davis, 156 Ill.2d 149, 159, 189 Ill.Dec. 49, 55, 619 N.E.2d 750, 756 (1993) (“in post-conviction proceedings, the [pjlain error rule may not be invoked to save procedurally defaulted claims”); Clemmons v. State, 795 S.W.2d 414, 418 (Mo.Ct.App.1990) (“There is no such thing as plain error in postconviction relief cases. Appellate review of the trial court’s action on a postconviction relief motion is ‘limited ’ to a determination of whether the findings and conclusions of the motion court are clearly erroneous.”); Prokopis v. State, 49 Md.App. 531, 534, 433 A.2d 1191, 1193 (1981) (“In urging that we now apply the plain error rule applicant is actually requesting that we consider this proceeding, not as an application for leave to appeal a denial of post conviction relief, but to recognize it as a direct appeal. We are not empowered to do so, however, even if we were so inclined.”).
Also, when reviewing the denial or dismissal of Davis’s Rule 32 claims we apply all of the procedural bars in Rule 32, Ala.R.Crim.P. “The procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.” State v. Tarver, 629 So.2d 14, 19 (Ala.Crim.App.1993). See also Burgess v. State, 962 So.2d 272 (Ala.Crim.App.2005); Hunt v. State, 940 So.2d 1041 (Ala.Crim.App.2005); Brooks v. State, 929 So.2d 491 (Ala.Crim.App.2005); Duncan v. State, 925 So.2d 245 (Ala.Crim.App. 2005); Slaton v. State, 902 So.2d 102 (Ala. Crim.App.2003); Wood v. State, 891 So.2d 398 (Ala.Crim.App.2003).
Last, “If the circuit court is correct for any reason, even though it may not be the stated reason, we will not reverse its denial of the petition.” Reed v. State, 748 So.2d 231, 233 (Ala.Crim.App.1999).
I.
Davis argues that he was denied the effective assistance of counsel at the guilt and penalty phase of his capital-murder trial. Specifically, he argues that counsel failed to prepare and to investigate the case. He cites numerous grounds in support of this assertion.[3]
*521 Davis was convicted of capital murder in December 1993; he was sentenced in March 1994. At the time Davis was convicted and sentenced Ex parte Jackson, 598 So.2d 895 (Ala.1992), was in effect.[4] In Jackson, the Supreme Court established a procedure for raising claims of ineffective assistance of trial counsel when new counsel was appointed for direct appeal. According to Jackson, the newly appointed appellate counsel could file a motion to suspend the time for the filing of a motion for a new trial so that a transcript of the trial proceedings could be completed. Newly appointed appellate counsel could then argue claims of ineffective assistance in the motion for a new trial and properly raise the issue on direct appeal. The Supreme Court in Jackson stated:
“We encourage counsel, whenever possible, to ascertain any possible defect in the trial process and to make an issue of that defect in an appropriate motion for a new trial. Failure to include a reasonably ascertainable issue in a motion for a new trial will result in a bar to further argument of the issue on appeal and in post-conviction proceedings.”
598 So.2d at 897.
In this case, Davis’s trial attorneys, Steven D. Giddens and Jonathan L. Adams, moved to withdraw from representing Davis after Davis was sentenced. The circuit court immediately appointed attorney H. Wayne Love to represent Davis on appeal. Love then moved the circuit court to extend the time for filing a motion for a new trial so that a transcript of the trial proceedings could be completed and he could review that transcript. Love also filed a motion for a new trial, alleging that Davis had been deprived of the effective assistance of counsel. He cited several different grounds in support of this assertion.[5] Here, newly appointed appellate counsel followed the procedures set out in Jackson.
In Payne v. State, 791 So.2d 383 (Ala.Crim.App.1999), a case involving the appeal of the denial of a Rule 32 petition attacking a death sentence, we stated:
“Because Payne was represented by different counsel at trial and on appeal, any claim of ineffective assistance of trial counsel should have been raised in a motion for a new trial in order to preserve the issue for review. Ex parte Jackson[, 598 So.2d 895 (Ala.1992)]. Thus, the trial court correctly concluded that Payne’s claims regarding ineffective assistance of trial counsel are procedurally barred by Rule 32.2(a)(3) and (a)(5) as claims that could have been, but were not, raised at trial or on appeal. See Bryant v. State, 739 So.2d 1138 (Ala.Cr.App.1998); Dyson v. State, 722 So.2d 782 (Ala.Cr.App.1997); Hartzog v. State, 733 So.2d 461 (Ala.Cr.App.1997); Adersch v. State, 716 So.2d 242 (Ala.Cr. App.1997); Arrington v. State, 716 So.2d 237 (Ala.Cr.App.1997); Alexander v. State, 679 So.2d 227 (Ala.1996); Coving-ton v. State, 671 So.2d 109 (Ala.Cr.App. 1995); Alderman v. State, 647 So.2d 28 (Ala.Cr.App.1994); Ex parte Jackson, supra.”
791 So.2d at 390.
According to established caselaw, Davis’s ineffective-assistance-of-trial-counsel claims are procedurally barred in this *522 Rule 32 proceeding.[6] See also Clemons v. State, [Ms. CR-01-1355, August 29, 2003, and June 24, 2005] — So.3d - (Ala. Crim.App.2003) (opinion on return to remand); Brooks v. State, 929 So.2d 491 (Ala.Crim.App.2005); and Mason v. State, 768 So.2d 981 (Ala.Crim.App.1998).[7]
We realize the harsh consequences that the application of this procedural bar has on inmates like Davis, who are incarcerated on Alabama’s death row. However, this Court has no authority to modify or amend the procedural bars contained in Rule 32, Ala.R.Crim.P.
Davis’s most troubling claim is that counsel failed to investigate and present mitigation evidence at the penalty phase. The evidence Davis alleges should have been discovered and presented is powerful. Had this issue not been procedurally barred we would be compelled to grant relief and order a new sentencing hearing.
At the Rule 32 hearing, Davis presented the testimony of two sisters, an aunt, and several social workers. Davis’s sisters testified that their mother regularly beat Davis with switches, extension cords, and brooms. Mary Nell Davis testified that she remembered one instance when Davis was in the second grade and their mother beat Davis so badly with a broom that his head swelled up and his ear was almost “severed.” She also said that when her mother was beating Davis he would call him a “black bastard.”
Beverly Boggs, a social worker with the Calhoun County Department of Human Resources (“DHR”), testified that her first contact with Davis was when he was about 10 years old. A report had been filed with DHR that Davis was being abused and neglected. Davis’s mother admitted to Boggs that she beat Davis because he was a bed wetter. The social worker recommended counseling for the child and mother.
Another social worker, Theresa Peebles, testified that she investigated a complaint that alleged that Davis was being abused when Davis was about 10 years old. Davis admitted to her that his mother beat him because he was a bed wetter. Peebles said that she observed the extent of Davis’s injuries on this occasion and that Davis had between 25 and 30 marks on his back. She said, “I’ve never seen a back that looked worse than Jimmy’s did.” Peebles made photographs of his injuries, and those photographs were introduced at the Rule 32 hearing.
At previously stated, Davis was represented at trial by attorneys Giddens and Adams. Giddens testified at the Rule 32 hearing; Adams, however, did not. Gid-dens’s fee declaration was introduced into evidence. The fee declaration showed that Giddens billed for 65 hours for in-court work and for 76 hours for out-of-court work related to Davis’s case.
Giddens testified that in preparation for the penalty phase he requested that a *523 psychological evaluation of Davis be performed.[8] He also spoke with Davis’s mother, Lillie Bell Davis.[9] Giddens said that Davis was not very forthcoming with information.[10] Adams did not testify at the Rule 32 proceedings as to his part in preparing for the penalty phase, nor did Giddens relate the extent of Adams’s involvement in preparing for the penalty phase. The record does show that attorney Adams had moved his office and that his file related to his work on Davis’s case had been misplaced or lost.
Giddens testified to the following concerning mitigation evidence:
“Q [Davis’s attorney]: But in your practice of defending capital cases, would you agree that an individual’s educational background, family situation and employment status are some of the few things that should be taken into consideration at the mitigation phase? “A [Giddens]: I think you need to take into consideration whatever evidence you can offer to a jury. Mitigation is simply that, to mitigate the sentence down to life [imprisonment] without parole and a lot of things to go into it. Educational background. I mean, lack of significant criminal history is one that you can offer. Many things are taken into mitigation. But simply asking for life without parole is asking to spare the death penalty, spare the defendant’s life. And that’s ultimately for the jury to make a recommendation. But I mean, you can offer, under the nonstatutory mitigation in Alabama, you can offer virtually anything.
“Q: And prior to becoming the District Attorney, when you’re defending these cases, how would you go about investigating that ‘virtually anything’ that you could put before a jury?
“A: Well, the ‘virtually anything’ is putting family members on, ‘Please spare my son’s life’; ‘Please spare my brother’s life’; ‘Please spare my mother’s life.’ ‘He was a good child. He played ball, he did this.’ And showing a picture of the defendant that maybe they didn’t get to see. And that’s— that’s what I’m talking about, the non-statutory mitigation is anything. Anything that they have ever done.
[[Image here]]
“Q: Have you ever offered evidence of physical child abuse?
“A: No.
“Q: If you found evidence of physical child abuse in a defendant’s life, would you offer that in a mitigation stage?
“A: If it was somehow related to the crime or if it — I mean, under nonstatu-tory mitigation, I’m sure it’s admissible. I’m sure you can get it in, but I personally did not ever do that.”[11]
(R. 75-76.) Giddens further testified that he spoke only with Davis’s mother and that he did not speak with any of Davis’s *524 siblings.[12] He did not attempt to get any of Davis’s school records or any records from DHR. Giddens was never questioned about Adams’s preparation for the penalty phase. Indeed, the State’s cross-examination of Giddens failed to elicit any information that would bolster the State’s position that a reasonable investigation was conducted in this case. Moreover, the record shows that most of the preparation was conducted two weeks before Davis’s trial.
We have also reviewed the transcript of the penalty phase. Counsel called Lillie Davis, Davis’s mother, to testify at the penalty phase. She told the jury that Davis’s father had left them when Davis was approximately one year old, that Davis did not have a father figure in his life, that Davis started giving her trouble when he was around 9, that Davis went to live with his father in New York when he was 15 years old, that Davis moved back after about two months because his father had died, and that Davis dropped out of school when he was 16 years old. She also said that Davis ran with a bad crowd, that he had never been involved in any violent behavior — just stealing — and that when he reached the age of 17 she asked him to leave her house because she could not control him. Last, she asked the jury to spare her son’s life.
Andrew Lamont Sigler, Davis’s first cousin, also testified at the penalty phase.[13] Sigler testified: “I think Jimmy was missing a lot as he was coming up. People to rely on, people to talk to, people who could understand him and try and help him out. A lot of things that we all have had, more successful people have had.” (Tidal record at p. 1322.) Sigler also asked the jury to spare Davis’s life.
Annie Storey, a psychometrist employed at the Calhoun-Cleburne Mental Health Center, testified that she performed several IQ tests on Davis, including the Wech-sler Adult Intelligence Scale Revised (“WAIS-R”) and that Davis’s full scale IQ was 77, which placed him in the borderline range of intelligence functioning. Storey said that Davis’s IQ would make it difficult for him to perform ordinary tasks.
After the penalty-phase jury deliberated for 40 minutes, it returned with a question. The question was whether the trial court could accept a recommendation of death if seven jurors voted for death and five for life. The trial court sent the jury back to deliberate and gave the following instruction:
“The Court has heard the responses both by the State and by the defendant to this question. Appears I have unanimity from each side of the case and no objections to the Court answering this question in the negative that no, the Court cannot accept the numbers as they state them. And further state there must be 10 votes for recommendation of death or there must be at least 7 votes for a recommendation of life without parole.”
(Record of trial, p. 1375-76.) After this instruction, the jury returned with a recommendation of 11 for death and 1 for life imprisonment without parole. Certainly, it is reasonable to conclude that the evidence of Davis’s child abuse could very well have tipped the scales in the other direction.
*525 Davis asserts that according to the United States Supreme Court’s decision in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), he is entitled to a new sentencing hearing. In Wiggins, the Supreme Court held that trial counsel’s performance was ineffective at the penalty phase of a capital-murder trial because counsel had failed to expand its investigation after discovering Department of Social Services (“DSS”) records. Counsel failed to discover that Wiggins had been severely beaten and tortured by his mother, who was an alcoholic, that he and his siblings had been left alone for days with no food and had been forced to beg for food and to eat paint chips and garbage, that Wiggins had been repeatedly sexually molested and raped while in foster custody and while in the Job Corps training program, and that Wiggins was borderline mentally retarded. Finding counsel’s performance ineffective, the United States Supreme Court stated:
“Counsel’s decision not to expand their investigation beyond the PSI [pre-sentence investigation] and the DSS [Baltimore City Department of Social Services] records fell short of the professional standards that prevailed in Maryland in 1989.... Counsel’s conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) — standards to which we long have referred as ‘guides to determining what is reasonable.’ Strickland [v. Washington], [466 U.S.] at 688 [(1984)]; Williams v. Taylor, [529 U.S.] at 396 [(2000)]. The ABA Guidelines provide that investigations into mitigating evidence ‘should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.’ ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner’s background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf. id., 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1982) (‘The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing.... Investigation is essential to fulfillment of these functions’).”
539 U.S. at 524-25,123 S.Ct. 2527. In this case counsel failed to conduct the type of investigation sanctioned by the guidelines developed by the American Bar Association for attorneys representing defendants in death-penalty cases as endorsed by the United States Supreme Court in Wiggins v. Smith.
Also, in this case the State relied on a prior robbery conviction to prove the aggravating circumstance that Davis had previously been convicted of a crime of violence. However, counsel testified that he did nothing to investigate this prior offense.[14] Recently, in Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d *526 360 (2005), the United States Supreme Court found that counsel’s performance was ineffective at the penalty phase of a capital trial because counsel failed to investigate a prior felony that the State was relying on to establish an aggravating circumstance. The United States Supreme Court stated:
“This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered ‘mitigating evidence, taken as a whole, “might well have influenced the jury’s appraisal” of [Rompilla’s] culpability,’ Wiggins, 539 U.S., at 538, 123 S.Ct. 2527 (quoting Williams v. Taylor, 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different result if the evidence had gone in is ‘sufficient to undermine confidence in the outcome’ actually reached at sentencing, Strickland, 466 U.S., at 694, 104 S.Ct. 2052.”
545 U.S. at 392, 125 S.Ct. at 2469. The same is true of this case.
“The Supreme Court has made clear that the ‘ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the “prevailing professional norms” in ineffective assistance cases.’ Hamblin v. Mitchell, 354 F.3d 482, 486 (6th Cir.2004) (quoting Wiggins, 539 U.S. at 524, 123 S.Ct. 2527). Those standards provide that investigations into mitigating evidence ‘should comprise efforts to discover all reasonably available mitigation evidence,’ which should include investigation into ‘medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences.’ Wiggins, 539 U.S. at 524, 123 S.Ct. 2527 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6 (1989) (emphases added)).”
Moore v. Parker, 425 F.3d 250, 261 (6th Cir.2005)(footnote omitted)(Martin, J., dissenting). Here, the Rule 32 testimony revealed that counsel failed to conduct the type of reasonable investigation sanctioned by the ABA. Indeed, had this claim not been procedurally barred we would be compelled to grant relief and order a new sentencing hearing.
II.
Davis next argues that the State suppressed evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Davis argues that the State failed to provide footprint evidence, failed to preserve his code-fendant’s clothes, failed to disclose threats made against Davis and his family, failed to reveal his codefendant’s gang involvement, and failed to reveal the identity of the informants.[15]
The circuit court made the following findings of fact on this claim:
“The petitioner failed to carry his burden of proof in establishing the existence of a valid Brady claim. The United States Supreme Court definitively held, in Brady v. Maryland, that ‘the government’s failure to disclose evidence favorable to the defendant who specifically requested it violates the defendant’s due *527 process rights when the evidence is material to the guilt or punishment.’ Smith v. State, 698 So.2d 189, 207 (Ala.Crim.App.1996); Brady v. Maryland, 373 U.S. at 87. To properly establish a Brady violation, the defendant must make a showing that (1) the prosecution suppressed evidence, (2) the evidence suppressed was favorable to the defendant or was exculpatory, and (3) the evidence suppressed was material to the issues at trial. Ex parte Kennedy, 472 So.2d 1106 (Ala.1985), cert. denied, 474 U.S. 975 (1985). ‘ “Materiality” requires a finding that, had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.’ Coral v. State, 628 So.2d 954, 979 (Ala.Crim.App.1992), affd on return to remand, 628 So.2d 988 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 114 S.Ct. 1387 (1994). ‘A “reasonable probability” is one sufficient to undermine confidence in the result.’ Coral v. State, 628 So.2d at 979; Pennsylvaiiia v. Ritchie, 480 U.S. 39 (1987); United, States v. Bagley, 473 U.S. 667 (1985); Rogers v. United States, 485 U.S. 969 (1988).
“Thus, in order for Davis to make a proper Brady claim, he must clearly show a suppression of evidence and that there was a reasonable probability, one sufficient to undermine confidence in the proper resolution of the case at trial, that the jury would have resolved his case differently had the prosecution disclosed the evidence in a timely manner. Id. There has been no such evidence established by the petitioner in this case, certainly nothing enumerated in items (a) through (s) of paragraph 67 in the second amended petition.
“Davis absolutely failed in this regard. Many of the items alleged in the petition were never mentioned during the Rule 32 hearing. One of the items mentioned, an alleged footprint at the scene, was referred to in a report handed over to the defense, never used at trial, and never explained at the hearing. Thus, Davis did not prove suppression as the defense was put on notice that this evidence may have existed, did not prove materiality (it is unclear if this item even exists, where it was located, how it was found, how it was documented, whether it was casted or photographed, etc.), and he did not prove that it was exculpatory.
“Based on the record before this Court, this claim is denied.”
(C.R. 1191-92.) The record of the Rule 32 proceedings supports the circuit court’s findings. Davis made no effort at the Rule 32 hearing to satisfy the requirements of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Davis thoroughly failed to meet his burden of proof under Rule 32.3, Ala.R.Crim.P.
Moreover, this claim is proceclurally barred for the reasons discussed by this Court in Williams v. State, 782 So.2d 811, 818 (Ala.Crim.App.2000):
“The appellant’s first argument is that the State withheld exculpatory information in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he contends that the State suppressed evidence that a potential witness had seen the appellant and the victim together in Mobile before the murder and evidence that a white Porsche automobile had been seen at the scene of the crime at about 3:30 p.m. on the day of the murder. The appellant did not assert that this claim was based on newly discovered evidence. Therefore, it is procedurally barred because he could have raised it at trial and on direct appeal, but did not. See Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P.; *528 Boyd v. State, 746 So.2d 364 (Ala.Cr.App.1999); Matthews v. State, 654 So.2d 66 (Ala.Cr.App.1994); Lundy v. State, 568 So.2d 399 (Ala.Cr.App.1990).”
III.
Davis argues that in his ease the death sentence is cruel and unusual punishment in violation of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), because he says he is mentally retarded and has frontal-lobe brain damage.
In denying this claim the circuit court stated that “[Davis] does not fall within the definition of defendants protected by the Court’s decision in Atkins even under the broadest of definitions.” (C.R. 1194.)
The United States Supreme Court in Atkins held that it was a violation of the Eighth Amendment to execute a mentally retarded individual. The Atkins Court left the definition of mental retardation to the individual states. Though Alabama has yet to enact legislation defining mental retardation, the Alabama Supreme Court in Ex parte Perkins, 851 So.2d 453 (Ala. 2002), adopted the broadest definition of mental retardation used by those states that have legislation prohibiting the execution of the mentally retarded. To satisfy the Perkins test, the defendant must exhibit (1) significantly subaverage intellectual functioning — an IQ of 70 or below; (2) significant or substantial deficits in adaptive behavior; and (3) these two deficiencies must have manifested themselves during the developmental years — before the defendant reached the age of 18.
We have reviewed the records of Davis’s trial and the Rule 32 proceedings. The record of the postconviction proceedings contains some of Davis’s school records and report cards. A report card issued to Davis in the eighth grade shows that Davis made all B’s and one C. (C.R. 1848.) Davis was also administered the Wechsler Intelligence Scale (“WISC-R”) IQ test in the eighth grade. The test results showed that Davis’s full-scale IQ was 74. This evaluation also contained the handwritten comment: “All areas are above grade level expectancy.” (C.R. 1853.)
At the penalty phase of Davis’s capital trial, Davis presented the testimony of Anne M. Storey, a counselor employed by Calhoun-Cleburne County Mental Health Center and the Oxford City School System. She testified that she administered IQ tests to Davis before his trial and that Davis had a full-scale IQ of 77.
At the postconviction hearing Davis presented testimony that when Davis was administered an IQ test while in the custody of the Alabama Department of Corrections his IQ measured in the high 70s. (R. 771.) Jan Vogelsang, a clinical social worker, also testified as follows:
“Jimmy had worked at a car wash. He had worked at Glen Addie housing project. Jimmy had not maintained consistent employment. Job Corps, he went away first with Job Corps to Kentucky and he got homesick and came back.
“Then he went to Tuskegee. In the Job Corps there they taught him with classes. They taught him brick masonry. He was gone about a year. He got his GED while he was there. Apparently did well.”
(R. 1004.)
Dr. Charles J. Golden, a professor of psychology at Nova Southeastern University and Director of the Neuropsychological Assessment Center, also testified at the Rule 32 hearing. Dr. Golden stated that based on his assessment of Davis’s IQ scores, Davis had frontal-lobe brain damage. In rebuttal, the State presented the testimony of Dr. Glen D. King, a clinical psychologist. Dr. King testified that after *529 evaluating Davis and his IQ scores, it was his opinion that Davis “merely had borderline intellectual functioning” and that he would not refer Davis to a neurologist. The experts testified that a CAT scan, a MRI, or a PET scan are traditionally used to diagnose brain damage.[16] However, none of these tests were administered in this case.
We have painstakingly reviewed the record of the trial and the Rule 32 proceedings and find no indication that Davis meets the most liberal definition of mental retardation adopted by the Alabama Supreme Court in Perkins. Therefore, Atkins does not bar the imposition of the death penalty in Davis’s case.
IV.
Davis argues that the Rule 32 court erred in excluding clinical social worker Jan Vogelsang’s entire binder of notes that consisted of a compilation of her findings regarding Davis’s social history.[17]
Initially, we note that Davis’s social history was introduced for the purpose of showing that mitigating evidence existed and that his trial counsel was ineffective for failing to introduce that evidence. However, in Part I of this opinion we held that Davis’s claims of ineffective assistance of trial counsel were procedurally barred because when Ex parte Jackson was in effect, Davis was tried. Accordingly, if any error did occur, it was rendered harmless by our holding in Part I.
Moreover, in his brief to this Court Davis argues that “[t]his issue merits this Court’s close attention because such an expert’s exhibit is indeed the very sort of exhibit that belongs in the jury room in the penalty phase deliberations of a capital murder case along with whatever supporting and discrediting evidence accompanies it.” (Davis’s brief at pp. 75-75.) The National Association of Social Workers (“NASW”) argues that social histories are reliable and important evidence and are widely used in capital-murder eases to show mitigation.
At the Rule 32 proceeding a plethora of other evidence was offered and admitted to show that mitigation evidence did exist.[18] Indeed, the evidence introduced and admitted at the hearing was similar to the evidence contained in Vogelsang’s social history binder.
When addressing a similar claim in Williams v. Anderson, 174 F.Supp.2d 843 (N.D.Ind.2001), aff'd, Williams v. Davis, 301 F.3d 625 (7th Cir.2002), a federal court when denying relief, likewise noted:
“Williams argues that the post-conviction court’s decision denied him due process by precluding the court from considering additional mitigating evidence, as mandated by Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In Skipper v. South Carolina, 476 U.S. 1, *530 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the Supreme Court held that excluding mitigating evidence as cumulative may be implausible under the facts of a case if the court cannot conclude that the excluded evidence would have had no impact on the jury’s deliberations. 476 U.S. at 8, 106 S.Ct. 1669. Thus, Williams argues that the Indiana Supreme Court’s determination that the evidence was cumulative impeded the court’s ability to consider all relevant facets of his character in determining his sentence, and thus violated Skipper.
“This court first notes that the evidence was excluded during post-conviction proceedings, and not during the actual trial. Thus, it is unclear whether the protection of Hitchcock, Eddings, Lockett, and Skipper apply at all.”
174 F.Supp.2d at 872-73.
The social history binder was admissible. The circuit court erred in not allowing this binder to be received into evidence; however, in this case, it is clear that the material in the binder was cumulative to Vogelsang’s thorough and lengthy Rule 32 testimony and to testimony offered by other witnesses at the Rule 32 hearing. “The exclusion of admissible evidence does not constitute reversible error where the evidence ‘would have been merely cumulative of other evidence of the same nature, which was admitted.’ ” Houston v. State, 565 So.2d 277, 281 (Ala.Crim.App.1990)(quoting Ex parte Lawson, 476 So.2d 122, 122 (Ala.1985)). Accordingly, for the reasons stated above we find no reversible error.
V.
Davis also argues that the circuit court erred in excluding other evidence related to Davis’s family environment. Davis’s brief on this issue consists of two paragraphs. Davis states only that the circuit court erroneously excluded hearsay and that hearsay evidence is admissible at the sentencing stage of a capital-murder trial. However, Davis does not identify what hearsay was excluded.
What Davis fails to consider is that this evidence was offered in a Rule 32 proceeding and not at the sentencing phase of a capital-murder trial. The Alabama Rules of Evidence do not apply to sentencing hearings, but do apply to Rule 32 proceedings. See Rule 101, Ala.R.Evid., and Rule 1101(a), Ala.R.Evid. Rule 804, AIa.R.Evid., specifically forbids the admittance of hearsay evidence. It appears that the circuit court correctly applied the law. We find no error here.
VI.
The following issues are procedurally barred in this postconviction proceeding because they could have been, but were not, raised at trial or on appeal. See Rules 32.3(a)(3) and (a)(5), Ala.R.Crim.P.
1. Davis was prejudiced by the State’s closing argument.
2. Davis’s death sentence was sought and imposed pursuant to a pattern of racial bias.
3. The fee cap for attorneys appointed to represent indigents foreclosed effective assistance of counsel.
For the foregoing reasons, we affirm the circuit court’s denial of Davis’s Rule 32 petition.
AFFIRMED.
McMILLAN, P.J., and WISE, J., concur. BASCHAB, J., concurs in the result, with opinion. SHAW, J., concurs in the result, without opinion.

. This Court may take judicial notice of our records in previous cases. See Ex parte Salter, 520 So.2d 213 (Ala.Crim.App.1987).

. Postconviction proceedings in Illinois are similar to Rule 32, Ala.R.Crim.P., proceedings.

. Additional grounds were raised in Davis's Rule 32 petition. However, the issues not raised on appeal are deemed to be abandoned. See Brownlee v. State, 666 So.2d 91 (Ala.Crim.App. 1995).

. In 1996, in Ex parte Ingram, 675 So.2d 863 (Ala. 1996), the Supreme Court reversed its holding in Jackson, citing the numerous procedural problems that Jackson had created.

. However, none of the grounds raised in the written motion for a new trial were pursued at the motion hearing.

. Davis makes no argument that his appellate counsel was ineffective. Claims of ineffective assistance of appellate counsel are properly raised in a Rule 32 petition. See Whitt v. State, 827 So.2d 869 (Ala.Crim.App.2001).

. "[AJ procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case ' "clearly and expressly” ’ states that its judgment rests on a state procedural bar.” Harris v. Reed, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The Alabama Supreme Court has remanded a case to this Court for this Court to state specifically that a claim of ineffective assistance of counsel was procedurally barred in a Rule 32 proceeding because it was not raised within the limitations period in Rule 32.2(c). See Baker v. State, 667 So.2d 50, 51 (Ala.1995).

. Apparently this request was misdirected, and a psychometrist who was not a psychologist was assigned to test Davis.

. Davis admitted that counsel spoke with two of his siblings, although at the Rule 32 hearing Giddens said he had spoken only with Davis's mother. It is possible that the two siblings spoke with Adams, but Adams did not testify.

. This is consistent with Dr. Glen King’s testimony at the Rule 32 hearing. Dr. King, a psychologist, testified that during his evaluation of Davis for the Rule 32 proceedings, Davis was not forthcoming with information about his childhood. (R. 863.)

.Evidence that a defendant was a victim of child abuse is a classic example of mitigating evidence; its admittance is not affected by whether the abuse directly related to the crime.

. Davis’s father was deceased at the time of trial.

. Sigler testified at the Rule 32 hearing that Davis’s attorneys had not contacted him before Davis’s trial but that on the day of sentencing he was in the courthouse and one of the attorneys asked him to testify.

. It appears that Davis had pleaded guilty to robbing a pizza delivery man of approximately $30-$40 and several pizzas.

. In Davis’s second amended petition he merely recites 19 different evidentiary items that he alleged the State suppressed.

. CAT is the acronym for computerized axial tomography; MRI is the acronym for magnetic resonance imaging; and PET is the acronym for positron emission tomography.

. The National Association of Social Workers ("NASW”) and its Alabama Chapter was granted leave to file and filed an amicus curiae brief on this issue.

.Rule 26.6(b)(2), Ala.R.Crim.P., states that at a sentencing hearing "[a]ny evidence that the court deems to have probative value may be received, regardless of its admissibility under the rules of evidence.” However, the Alabama Rules of Evidence apply to postcon-viction proceedings. See DeBruce v. State, 890 So.2d 1068 (Ala.Crim.App.2003), rev'd on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005).