On Application for Rehearing

KELLUM, Judge.
The opinion issued on December 14, 2012, is withdrawn, and the following opinion is substituted therefor.
Donald Broadnax appeals the circuit court’s denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P.
In 1997, Broadnax was convicted of four counts of capital murder for the beating deaths of his wife, Hector Jan Stamps Broadnax, and her four-year-old grandson, DeAngelo Stamps. The murders were made capital (1) because two or more persons were murdered pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975; (2) because Broadnax had been convicted of another murder in the 20 years- preceding those murders, see § 13A-5-40(a)(13), Ala.Code 1975; (3) because the murders were committed during the course of a kidnapping, see § 13A-5-40(a)(1), Ala.Code 1975; and (4) because DeAngelo Stamps was under 14 years of age at the time of his death, see § 13A-5^0(a)(15), Ala.Code 1975. The jury unanimously recommended that Broadnax be sentenced to death for his convictions, and the trial court followed the jury’s recommendation and sentenced Broadnax to death. This Court affirmed Broadnax’s convictions and sentence on appeal, Broadnax v. State, 825 So.2d 134 *1237 (Ala.Crira.App.2000),[1] and the Alabama Supreme Court affirmed this Court’s judgment, Ex parte Broadnax, 825 So.2d 233 (Ala.2001). This Court issued a certificate of judgment on January 16, 2002. The United States Supreme Court denied cer-tiorari review on June 28, 2002. Broadnax v. Alabama, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002).
In this Court’s opinion affirming Broad-nax’s convictions and sentence, we set out the facts of the crimes as follows:
“The evidence tended to show the following. In April 1996, Donald Broad-nax, who had been convicted in 1978 for murder and who was serving a sentence of 99 years’ imprisonment, was residing at a work release center in Alexander City and working at Welborn Forest Products in Alexander City. In 1995 Broadnax married Hector Jan Stamps Broadnax, who at the time of the marriage had a three-year-old grandson, DeAngelo Stamps. Broadnax and Jan were having marital problems and Broadnax believed that Jan was partially responsible for a recent denial of parole. The evidence indicated that after 6:00 p.m. on April 25, 1996, Jan and DeAngelo delivered food to Broadnax at his workplace. Johnny Baker, an inmate at the work release center and Broadnax’s coworker at Welborn, testified that he saw Broadnax driving Jan’s car at Welborn that evening![2] According to Baker, Broadnax stopped to talk with him and he saw a child in a child’s safety seat in the backseat. Baker testified that he was ‘pretty sure’ the child was alive when he talked with Broad-nax![3]
“At approximately 10:45 p.m. that same night, Mark Chastain, a [supervisor] at Welborn, found Broadnax inside a building while securing the building for the night. Chastain testified that he told Broadnax that the alarm had been set and that they had to exit the building. According to Chastain, when he asked Broadnax why he was still in the building, Broadnax stated that the work release van had dropped him off.... [4]
“Kathy Chastain, Mark Chastain’s wife, testified that while she was outside the building waiting for her husband to secure the building, she saw an individual matching Broadnax’s description get out of a [white king-cab pickup truck] and run into the building.
“On April 25, 1996, Robert Williams and his wife were living across the street from a house in Birmingham that had in the past been used as a ‘crack-house’ and for prostitution. On that evening as Williams and his wife left their house at approximately 8:20 p.m., they noticed no cars were parked at the house across the street. When they returned at approximately 8:50 p.m., they saw a white Dodge Aries automobile parked behind the house. Because of the previous illegal activities occurring at the house, Williams telephoned the police and reported the presence of the car.
*1238 “Alondo McCurdy and Donna Smith, officers for the Birmingham Police Department, responded to the call and arrived at the residence at approximately 9:00 p.m. When they approached the parked car, they noticed blood on the ground behind the car and on the bumper. Based on their observations, they immediately radioed their supervisor and the paramedics, and secured the scene. It was later determined that the car belonged to Jan Broadnax.
“When the paramedics arrived, they opened the locked trunk and found the bodies of Jan and DeAngelo in the trunk. Both Jan and DeAngelo had been beaten. According to Dr. Robert Brissie, the forensic pathologist who performed the autopsies on the victims, blunt-foree trauma, which could have been caused by the use of a piece of lumber such as the one found in the trunk with the bodies, caused the deaths of Jan and DeAngelo.[5]
“On April 27, 1996, Lawrence Hard-nette, an inmate resident at the work release center in Alexander City, found a work uniform that did not belong to him stuffed under his bunk. At about the same time, James Smith, another inmate resident of the work release center, found a pair of Red Wing brand work boots under his bunk. The uniform and the boots were turned over to the supervisors and were later identified as belonging to Broadnax. Broadnax was the only one at the work center who wore Red Wing work boots; there were also identifying marks on the work uniforms indicating that the uniforms had been issued to Broadnax. When the work uniform and the boots were examined, bloodstains were found on the uniform [and the boots]. The analysis of the bloodstains [on the uniform] indicated that the deoxyribonucleic acid (‘DNA’) in these bloodstains matched the DNA of Jan and DeAngelo.[6]
“On the grounds at Welborn near a finishing products storage facility, employees found an earring that matched an earring found on the rear floorboard of Jan’s car. The evidence appeared to indicate that Jan was killed at Broad-nax’s workplace in Alexander City, that her body was placed in the trunk of the car, and that the car was driven to Birmingham. Officer Vince Cunningham of the Birmingham Police Department testified that while conducting the investigation, he traveled from the location where the bodies were found in Birmingham to Broadnax’s workplace in Alexander City [several times and determined that the drive time was no more than one and one-half hours]. [Thus, according to Cunningham, Broadnax could have easily traveled the distance between the two locations within the time frame set out by the evidence.”
825 So.2d at 150-51.
In addition to the above, the State presented evidence at trial indicating that the piece of lumber found in the trunk of the vehicle with the victims was similar to the lumber used at Welborn and that a blue cloth similar to cloth used at Welborn was also found in the trunk of the vehicle. The State also presented evidence indicating that the blood spatter on the rear of the vehicle was consistent with a beating. The State presented testimony that a few days before the murders Broadnax had told a fellow employee at Welborn that he was upset with Jan regarding the denial of his *1239 parole, which had occurred on April 15, 1996, and that he was planning to kill Jan. The State also presented testimony regarding two statements Broadnax made to the police. In his statements, Broadnax said that Jan had brought him dinner at Welborn the night of the murders and that she had left Welborn at approximately 8:20 p.m. Broadnax also said that he had been at Welborn the entire day and evening of the murders, until approximately 10:45 p.m., and that he had telephoned his brother from Welborn at approximately 9:00 p.m. However, the State introduced telephone records indicating that no telephone call had been made to Broadnax’s brother’s house the night of April 25, 1996. When questioned specifically about the bloody boots and the Welborn work uniform belonging to him that were found in the work-release facility, Broadnax stated that he had sold the boots to another inmate, although he could not identify that inmate, approximately a year earlier and that the uniform had been stolen about two months earlier. Broadnax also said that he had reported the theft of his uniform to the company who made and rented the uniforms to Welborn; however, the State presented testimony at trial that no report of a stolen uniform had been made to the uniform company.
The State’s theory of the case was that between approximately 6:30 p.m. and 10:30 p.m. the night of April 25, 1996, Broadnax brutally beat his wife, Jan, to death at Welborn; put Jan’s body in the trunk of her car; drove the car with Jan’s grandson, DeAngelo, in the backseat, to Birmingham to a location near Elyton Village where Broadnax had grown up and presumably had friends; brutally beat DeAn-gelo to death in that location; placed DeAngelo’s body in the trunk of the car with Jan’s body; and found someone to drive him back to Welborn, where Mark and Kathy Chastain saw Broadnax around 10:30 p.m.
The defense’s theory of the case was that Broadnax had been at Welborn all day and all evening on April 25, 1996 — as Broadnax had said in his statements to police — and that the State’s evidence was insufficient to prove that Broadnax had committed the murders. Although the defense called no witnesses, they vigorously cross-examined the State’s witnesses and called into question the State’s time line of events as well as the credibility of the State’s witnesses, some of whom were inmates themselves.
On June 25, 2003, Broadnax, through counsel, filed a timely Rule 32 petition, raising numerous claims.[7] On September 24, 2003, the State responded to the petition. On September 26, 2003, the circuit court summarily dismissed several of the claims in Broadnax’s petition and ordered Broadnax to amend several other claims to comply with the pleading requirements in Rule 32.3 and Rule 32.6(b). After obtaining multiple extensions, Broadnax filed his first amended petition on January 16, 2004, in which he incorporated all the claims from his original petition and expanded on some of those claims. On March 8, 2004, and March 10, 2004, respectively, the State responded to the first amended petition. On March 23, 2004, the circuit court summarily dismissed several of the claims in Broadnax’s petition and scheduled an evidentiary hearing on the remaining claims.
*1240 On April 8,- 2005, Broadnax filed a motion for leave to amend his petition, a motion for funds for a psychological evaluation and a sociological report, and a motion for discovery. On April 15, 2005, the State filed oppositions to all of Broadnax’s motions, and the circuit court held a hearing on the motions the same day, after which it denied .the motions. The circuit court held an evidentiary hearing on the remaining claims in Broadnax’s first amended petition on May 23, 2005. On June 14, 2005, the circuit court issued an order denying the remaining claims in the first amended petition, and Broadnax appealed.
On appeal, this Court reversed the circuit court’s judgment and remanded the case for further proceedings on the ground that the circuit court had erred in denying Broadnax’s April 8, 2005, motion to amend his petition. Broadnax v. State, 987 So.2d 631 (Ala.Crim.App.2007). The Alabama Supreme Court denied the State’s petition for certiorari review, and this Court issued a certificate of judgment on December 21, 2007. On May 12, 2008, Broadnax filed in the circuit court a second amended petition, in which he expanded on a few of the claims from his first amended petition and raised several new claims that had not previously been raised. On July 7, 2008, the State filed an answer and a motion for summary dismissal of Broadnax’s second amended petition, in which it requested summary dismissal of all of Broadnax’s claims on the grounds that the claims were precluded, that they were insufficiently pleaded, that they were meritless, or that they failed to state a material issue of fact or law.
After a lengthy discovery process and several status conferences, the circuit court conducted an evidentiary hearing on Broadnax’s second amended petition on March 14, 2011. The circuit court accepted post-hearing briefs from the parties, and on May 6, 2011, the circuit court issued a thorough order denying Broadnax’s second amended petition. This appeal followed.[8]

Standard of Review

“[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). “However, where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, ‘[t]he standard of review on appeal ... is whether the trial judge abused his discretion.when he denied the petition.’” Boyd v. State, 913 So.2d 1113, 1122 (Ala.Crim.App.2003) (quoting Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992)). “When conflicting evidence is presented ... a presumption of correctness is applied to the court’s factual determinations.” State v. Hamlet, 913 So.2d 493, 497 (Ala.Crim.App.2005). As explained in Brooks v. State, 929 So.2d 491 (Ala.Crim.App.2005):
“ ‘The resolution of ■.. factual issue[s] required the trial judge to weigh the credibility of the witnesses. His determination is entitled to great weight on appeal.... “When there is conflicting testimony as to a factual matter ..., the question of the credibility of the witnesses is within the sound discretion of the trier of fact. His factual determinations are entitled to great *1241 weight and will not be disturbed unless clearly contrary to the evidence.” ’
“Calhoun v. State, 460 So.2d 268, 269-70 (Ala.Crim.App.1984) (quoting State v. Klar, 400 So.2d 610, 618 (La.1981)).”
929 So.2d at 495-96.
Moreover:
“‘The burden of proof in a Rule 32 proceeding rests solely with the petitioner, not the State.’ Davis v. State, 9 So.3d 514, 519 (Ala.Crim.App.2006), rev’d on other grounds, 9 So.3d 537 (Ala.2007). ‘[I]n a Rule 32, Ala. R.Crim. P., proceeding, the burden of proof is upon the petitioner seeking post-conviction relief to establish his grounds for relief by a preponderance of the evidence.’ Wilson v. State, 644 So.2d 1326, 1328 (Ala.Crim.App.1994). Rule 32.3, Ala. R.Crim. P., specifically provides that ‘[t]he petitioner shall have the burden of ... proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.’ ”
Wilkerson v. State, 70 So.3d 442, 451 (Ala.Crim.App.2011).
I.
Broadnax contends that the circuit court erred in adopting verbatim the State’s proposed order denying his second amended petition. Relying on Ex parte Ingram, 51 So.3d 1119 (Ala.2010), he argues that the order “contains patently erroneous statements that undermine any confidence that [the] order is the product of the trial judge’s independent judgment.” (Broadax’s brief, at 57.) However, Broad-nax cites only one statement in the circuit court’s order, albeit a statement made repeatedly throughout the order, that he believes was erroneous — the statement that Broadnax did not call his two trial attorneys to testify at the Rule 32 hearing. According to Broadnax, because he did call both of his trial attorneys to testify at the hearing on his first amended petition, held on May 23, 2005, this statement by the circuit court was erroneous and indicates that the findings in the order are not the independent findings of the circuit court.
, The record reflects that Broadnax did not raise this issue in the circuit court, by way of postjudgment motion, or otherwise. Cf. Loggins v. State, 910 So.2d 146, 149 (Ala.Crim.App.2005) (recognizing a motion to reconsider as a valid post-judgment motion in the Rule 32 context). It is well settled that “[t]he general rules of preservation apply to Rule 32 proceedings.” Boyd v. State, 913 So.2d 1113, 1123 (Ala.Crim.App.2003). See also Slaton v. State, 902 So.2d 102, 107-08 (Ala.Crim.App.2003) (holding that claim that the circuit court erred in adopting State’s proposed order was not preserved for review when it was never presented to the circuit court). Therefore, this issue was not properly preserved for this Court’s review and will not be considered.
II.
Broadnax also contends that the circuit court erred when, over his objection, it prohibited Dr. Kenneth Benedict, a neuropsychologist who had performed a psychological evaluation of him for the Rule 32 proceedings, from testifying at the March 14, 201 i, hearing on his second amended Rule 32 petition to the substance of statements made to Dr. ■ Benedict by Broadnax and Broadnax’s family members regarding Broadnax’s allegedly troubled childhood. He argues that the information Dr. Benedict received from him and from his family members about his childhood, although hearsay,[9] was necessary for Dr. *1242 Benedict’s psychological evaluation of him and would have been admissible at the penalty phase of his trial as mitigation evidence. Thus, Broadnax concludes, he should have been allowed to present the information regarding his allegedly troubled childhood through the testimony of Dr. Benedict at the Rule 32 hearing in order to prove the claim in his petition that his trial counsel were ineffective for not seeking a psychological evaluation of him for mitigation purposes (see Part III.B. of this opinion), and the refusal of the circuit court to permit him to present this hearsay evidence denied him due process.[10]
In Waldrop v. State, 987 So.2d 1186 (Ala.Crim.App.2007), this Court addressed a similar issue as follows:
“Waldrop argues that the circuit court erred in excluding hearsay mitigating evidence at his Rule 32 evidentiary hearing. He argues that because hearsay evidence is admissible at a sentencing hearing in a capital-murder trial, it is also admissible at a postconviction proceeding attacking a death sentence.
“However, Waldrop’s argument is inconsistent with prior cases of this Court. As we stated in Hunt v. State [, 940 So.2d 1041 (Ala.Crim.App.2005) ]:
“‘The Alabama Rules of Evidence apply to Rule 32 proceedings. Rule 804, Ala. R. Evid., specifically excludes hearsay evidence. We addressed this identical issue in Giles v. State, 906 So.2d 963 (Ala.Crim.App.2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005), and stated:
“ ‘ “Giles specifically argues that the circuit court erroneously failed to consider the hearsay testimony of two witnesses as to what Giles told them about a drug relationship between him and Carl Nelson. Giles argues that the circuit court misapplied the evidentiary rules governing capital sentencing because hearsay evidence is admissible at the sentencing portion of a capital-murder trial.
“ ‘ “However, what Giles fails to consider is whether the Rules of *1243 Evidence apply to Rule 32 proceedings. See Rule 101, Ala. R. Evid., and Rule 1101(a), Ala. R. Evid., which states, in part, ‘these rules of evidence apply in all proceedings in the Courts of Alabama-’ Rule 1101(b), Ala. R. Evid., lists the proceedings exempt from application of the Rules of Evidence. Those proceedings include proceedings concerning preliminary questions of fact, grand jury proceedings, extradition proceedings, preliminary hearings in criminal cases, sentencing or probation revocation hearings, proceedings related to the issuance of a warrant of arrest, criminal summonses, or search warrants, bail proceedings, and contempt proceedings.
“ ‘ “The Rules of Evidence apply to posteonviction proceedings. See DeBruce v. State, 890 So.2d 1068 (Ala.Crim.App.2003). Rule 804, Ala. R. Evid., specifically excludes hearsay evidence. The circuit court correctly applied existing law and excluded the hearsay statements presented concerning an alleged drug relationship between Giles and one of the victims. After excluding the hearsay evidence, the circuit court was left with no lawful evidence to support this contention. Relief was correctly denied on this ground. See DeBruce, supra.”
“ ‘906 So.2d at 985-86. The circuit court committed no error in excluding the affidavits and the hearsay testimony. ...’
“940 So.2d at 1051.”
987 So.2d at 1190. See also McWhorter v. State, [Ms. CR-09-1129, September 30, 2011] — So.3d-,-(Ala.Crim.App. 2011) (“[T]he rules of evidence apply to postconviction proceedings, and the circuit court should exclude inadmissible hearsay.”); and Davis v. State, 9 So.3d 514, 530 (Ala.Crim.App.2006), rev’d on other grounds, 9 So.3d 537 (Ala.2007) (“The Alabama Rules of Evidence do not apply to sentencing hearings, but do apply to Rule 32 proceedings.”). Therefore, the circuit court properly concluded that Dr. Benedict’s hearsay testimony was inadmissible at a Rule 32 hearing.
Moreover, we reject Broadnax’s argument that exclusion of Dr. Benedict’s hearsay testimony denied him a full and fair hearing and his right to due process. In McWhorter, supra, this Court analyzed a similar issue arising in postconviction proceedings. There, the circuit court excluded testimony by clinical social worker Janet Vogelsang regarding statements made to her by McWhorter’s family members — testimony that was offered by McWhorter to prove the claim in his Rule 32 petition that his trial counsel had been ineffective for not properly investigating and presenting mitigation evidence at the penalty phase of his capital-murder trial. After first holding that the circuit court’s exclusion of the hearsay testimony was proper, this Court also concluded that exclusion of the testimony did not violate McWhorter’s constitutional rights. We explained:
“McWhorter next argues that the exclusion of hearsay testimony violated his rights both under the federal and the state constitution. Specifically, McWhorter argues that the exclusion of hearsay statements during his postcon-viction hearing violated his right to present a complete defense. To support his position McWhorter ... cites Sears [v. Upton, — U.S. -, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010) ]. Here, McWhorter contends that Sears stands for the proposition that ‘hearsay rules *1244 cannot be used to exclude evidence during postconviction hearings in capital cases,’ which, he says, is a principle rooted in the ‘defendant’s well-recognized right under the compulsory process and due process clauses to present witnesses on his own behalf.’ (McWhorter’s brief, pp. 77-78). As stated above, McWhorter misinterprets Sears. Sears does not abrogate state hearsay rules during postconviction hearings; rather, the United States Supreme Court reiterated the Strickland test in Sears and reversed the lower court’s judgment because it failed to properly apply that test.
“To further support his argument McWhorter cites Chambers v. Mississippi 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), which, he says, hold that ‘the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.’ (McWhorter’s brief, p. 78). McWhorter also cites Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), and Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), which, he says, hold that a defendant has the ‘right to place before the sentencer relevant evidence in mitigation of punishment.’ (McWhorter’s brief, p. 78). These cases, however, are also distinguishable from McWhorter’s case.
“In Chambers, a defendant’s request to cross-examine a key witness was denied by the lower court based on a Mississippi common-law rule, which prevented a party from impeaching its own witness. The defendant attempted to call witnesses to testify to what they heard the key witness say; the lower court, however, excluded the testimony on the basis that it was hearsay. The Supreme Court held that the
“ ‘testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers’ defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.’
“Chambers, 410 U.S. at 302.
“In Crane, a defendant sought to introduce testimony about the environment in which the police secured his confession. Part of his defense was to show that because there was no physical evidence tying him to the crime the jury should not believe his confession. To support his defense, he sought to paint a picture of a young, uneducated boy who was kept against his will in a small, windowless room for a long period. The lower court, however, precluded him from putting on any testimony about the environment in which the interrogation took place. The Supreme Court held that a defendant has a meaningful opportunity to present a complete defense, which is an empty opportunity if the State were ‘permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant’s claim of innocence.’ Crane, 476 U.S. at 691.
“In Gardner, the defendant was convicted of murder. During the sentencing phase of trial the lower court relied on a presentence investigation report to sentence the defendant to death. The report, however, contained confidential information that the lower court did not *1245 put in the record during the sentencing hearing. Additionally, the lower court did not disclose the information to the Supreme Court of Florida. The United States Supreme Court held that the record on appeal must disclose to the reviewing court the considerations that motivated a death sentence in every case in which it is imposed. Gardner, 430 U.S. at 362.
“In Skipper, the defendant sought to introduce testimony during a sentencing hearing from two jailers and a jail visitor that the defendant ‘made a good adjustment’ while he was in jail. The lower court excluded the evidence because of a state rule that provided that such evidence was irrelevant and inadmissible. The Supreme Court held that in capital cases the sentencer should ‘not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.’ Skipper, 476 U.S. at 4.
“Herb, although Vogelsang was precluded from testifying as to certain conversations she had with McWhorter’s family members because the statements were hearsay, nothing precluded McWhorter from calling those family members as witnesses at the postconviction proceeding. The circuit court ruled that, as an expert, Vogelsang could not testify to her conclusions drawn from facts and data that were not in evidence. To remedy this, McWhorter simply had to elicit testimony from the witnesses that would be necessary to put the facts and data into evidence that would allow Vogelsang to provide her complete opinion. This is different from the situations presented in Chambers, Crane, Gardner, and Skipper, where the lower courts precluded the defendants from putting on any evidence with regard to their respective defenses. The burden of presenting the evidence necessary to entitle a petitioner to postconviction relief rests squarely on the petitioner. See Rule 32.3, Ala. R.Crim. P. Because McWhorter did not put on all the witnesses needed to meet his burden, the circuit court did not infringe on his right to present a complete defense.” .
McWhorter, - So.3d at-
Similarly, in' this case, as in McWhorter, although Dr. Benedict was precluded from testifying about statements made to him by Broadnax and Broadnax’s family members regarding Broadnax’s allegedly troubled childhood,,nothing prevented Broad-nax from calling his family members to testify or from testifying himself[11] regarding the same information that had allegedly been provided to Dr. Benedict. In fact, Broadnax called several of his family members to testify at the hearing on his first amended petition on May 23, 2005, specifically, his two sisters Dorothy McKinstry and Annette McKinstry, his two nephews LaQuintas McKinstry and Joseph DeAn-gelo McKinstry, and his niece Chiquita Swift, However, the testimony of Dorothy and Annette largely refuted Broadnax’s claims regarding physical abuse in his childhood, see note 24, infra, and none of the witnesses were ever questioned about any of the other information regarding Broadnax’s allegedly troubled childhood that had been provided to Dr. Benedict. Because Broadnax could have presented the information regarding his troubled childhood by other means that would have *1246 complied with evidentiary rules, but did not, Broadnax was not denied due process by the circuit court’s proper application of the Alabama Rules of Evidence.
III.
Broadnax also contends that the circuit court erred in denying two of the claims of ineffective assistance of trial counsel raised in his second amended petition, specifically, the claims that his trial counsel, Bill Brower and Darryl Bender, were ineffective for not adequately investigating and presenting at the guilt phase of the trial the alibi that he was at the Alexander City work-release facility at 9 p.m. on the night of the murders and for not obtaining a psychological evaluation of him for purposes of mitigation.
“ ‘In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
“ ‘ “First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.”
“ ‘466 U.S. at 687, 104 S.Ct. at 2064.
“ ‘ “The performance component outlined in Strickland is an objective one: that is, whether counsel’s assistance, judged under ‘prevailing professional norms,’ was ‘reasonable considering all the circumstances.’ ” Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App.1994), cert. denied, [514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995) ], quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. “A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel’s challenged conduct on the facts of the particular case, viewed as of the time of counsel’s conduct.” Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
“ ‘The claimant alleging ineffective assistance of counsel has the burden of showing that counsel’s assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff’d, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). “Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel’s part, the court must determine whether those acts or omissions fall ‘outside the wide range of professionally competent assistance.’ [Strickland,] 466 U.S. at 690, 104 S.Ct. at 2066.” Daniels, 650 So.2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel’s conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr.App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr.App.1985). “This court must avoid using ‘hindsight’ to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at *1247 the time of counsel’s actions before determining whether counsel rendered ineffective assistance.” Hallford, 629 So.2d at 9. See also, e.g., Cartwright v. State, 645 So.2d 326 (Ala.Cr.App.1994).
“ ‘ “Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ There are countless ways to provide effective assistance in any given ease. Even the best criminal defense attorneys would not defend a particular client in the same way.”
‘“Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
“ ‘ “Even if an attorney’s performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that ‘there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ [Strickland, ] 466 U.S. at 694, 104 S.Ct. at 2068.”
“ ‘Daniels, 650 So.2d at 552.
“ ‘ “When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.”
“ ‘Strickland, 466 U.S. at 697, 104 S.Ct. at 2069, quoted in Thompson v. State, 615 So.2d 129, 132 (Ala.Cr.App.1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993).
[[Image here]]
“Bui v. State, 717 So.2d 6, 12-13 (Ala.Cr.App.1997), cert. denied, 717 So.2d 6 (Ala.1998).”
Dobyne v. State, 805 So.2d 733, 742-44 (Ala.Crim.App.2000), aff’d, 805 So.2d 763 (Ala.2001).
With respect to counsel’s duty to investigate, this Court has explained:
“While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, ‘this duty only requires a reasonable investigation.’ Singleton v. Thigpen, 847 F.2d 668, 669 (11th Cir.(Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Morrison v. State, 551 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. *1248 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel’s obligation is to conduct a ‘substantial investigation into each of the 'plausible lines of defense.’ Strickland, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). ‘A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.’ Id., 466 U.S. at 686, 104 S.Ct. at 2063.”
Jones v. State, 753 So.2d 1174, 1191 (Ala.Crim.App.1999).
“[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.”
Strickland v. Washington, 466 U.S. 668, 690-91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
“The reasonableness of the investigation involves ‘not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.’ ” St. Aubin v. Quarterman, 470 F.3d 1096, 1101 (5th Cir.2006) (quoting Wiggins v. Smith, 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). “[B]efore we can assess the reasonableness of counsel’s investigatory efforts, we must first determine the nature and extent of the investigation that took place.... ” Lewis v. Horn, 581 F.3d 92, 115 (3d Cir.2009). Thus, “[ajlthough [the] claim is that his trial counsel should have done something more, we [must] first look at what the lawyer did in fact.” Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir.2000). Finally:
“The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel’s conversations with the defendant may be critical to a proper assessment of counsel’s investigation decisions, just as it may be critical to a proper assessment of counsel’s other litigation decisions. See United States v. Decoster, [199 U.S.App. D.C. 359,] 372-373, 624 F.2d [196,] 209-210 [ (D.C.1976) ].”
Strickland, 466 U.S. at 691, 104 S.Ct. 2052.
With these principles in mind, we address each of Broadnax’s claims in turn.
A.
First, Broadnax argues on appeal, as he did in his second amended petition, that *1249 Brower and Bender were ineffective for not adequately investigating and presenting at the guilt phase of the trial an alibi defense that he was at the Alexander City work-release facility at 9:00 p.m. on the night of the murders. Specifically, he argues that a proper and adequate investigation would have resulted in the discovery of witnesses from the work-release facility, witnesses who testified at the Rule 32 hearing, who saw him at the facility the night of the murders at 9:00 p.m., “a time which would have made it impossible for him to have committed” the murders and dumped the bodies in Birmingham, a one and one-half hour drive from Alexander City, between 8:20 p.m. and 8:55 p.m., as the State’s evidence at trial indicated. (Broadnax’s brief, at 28-29.)[12]
Before addressing this claim, we first point out the obvious: This claim is based on an alibi defense that directly contradicts the alibi defense presented at Broad-nax’s trial. In his statements to police, in his statements to his trial attorneys (see discussion below), and at trial, Broadnax claimed that he was at Welborn, not at the work-release facility, until about 10:45 p.m. the night of the murders. Indeed, from all that appears, Broadnax continued claiming to have been at Welborn that night for many years after his convictions and sentence. Even in both his original petition, filed in 2003, and his first amended petition, filed in 2004, Broadnax continued in his assertion that he was at Welborn the night of the murders. It was not until 2008, 12 years after the crime, and after this Court had reversed the judgment denying his first amended petition and Broadnax had obtained new Rule 32 counsel to represent him, that Broadnax suddenly changed his story regarding his whereabouts the night of the murders and asserted that he was not at Welborn, as he had alleged for 12 years, but was at the Alexander City work-release facility at 9:00 p.m. the night of the murders. Although we review this claim under the same principles of law as any other ineffective-assistance-of-counsel claim, we do so with caution, keeping in mind that it is based entirely on a newfound defense.
In support of this claim, Broadnax introduced into evidence at the March 14, 2011, hearing (hereinafter “the 2011 hearing”) a “Daily Sign In and Out Log” (hereinafter “inmate log”) from the Alexander City work-release facility for April 25, 1996, the day of the murders. (C. 902.) Testimony at the 2011 hearing indicated that when an inmate left the facility, he was required to sign his name next to his assigned bed number on the inmate log, write the time he was leaving the facility, and write his destination. When an inmate returned to the facility, he was required to again sign *1250 his name next to his assigned bed number and write the time he returned to the facility. Although the inmate log was kept by the facility, near the front office, the inmates were not specifically supervised when signing in and out to ensure the times and locations written by the inmates were accurate.[13]
Testimony indicated that the inmate log was used by the correctional officers at the facility to verify head counts conducted periodically throughout the day and night. Specifically, the officers would conduct a head count of the inmates physically present in the facility and then compare that count to the inmate log to determine who was supposed to be in the facility at the time of the head count. If an inmate who was absent during the head count had not signed in on the inmate log as having returned from work, then the inmate was considered to have been properly away from the facility and thus accounted for. If, on the other hand, an inmate who was absent during the head count had signed in on the inmate log, then the inmate was considered to be unaccounted for, and the officers would know that the inmate may have escaped. The inmate log for the night of the murders contains Broadnax’s name next to bed no. 69, a departure time of 5:80 a.m. to the “C. Shop”[14] and a return time of 9:00 p.m. (C. 904.)
To rebut the inmate log, the State introduced into evidence at the 2011 hearing a “Work Release Center Log” maintained by correctional officers (hereinafter “the officer log”), from the Alexander City work-release facility. (C. 894.) Testimony at the 2011 hearing indicated that the officer log contained notations by the correctional officers at the facility regarding the activities of any given day, including the comings and goings of the inmates as well as the various duties performed by the correctional officers. Testimony at the 2011 hearing indicated that when inmates returned from their jobs in the work-release vans (the facility had more than one van) one correctional officer would watch each inmate get out of the van and call out that inmate’s name so that another correctional officer could then write in the officer log the name of the returning inmate and the time of the inmate’s return. The officer log for April 25, 1996, the night of the murders, contains a notation that Broad-nax returned to the work-release facility at 11:50 p.m., not 9:00 p.m. as Broadnax wrote on the inmate log.
Broadnax also called to testify at the 2011 hearing four witnesses to support this claim — Macarthur Whetstone and Floyd Cumbie, former correctional officers who had worked at the Alexander City work-release facility and who knew Broadnax, and Donald Jerome Bowden and James A. Smith, inmates formerly housed at the Alexander City work-release facility who knew Broadnax. He further introduced into evidence an affidavit from Roger A. Stolz Jr., also an inmate formerly housed at the Alexander City work-release facility who knew Broadnax, in an attempt to support his claim that he was at the work-release facility at 9:00 p.m. on the night of the murders.[15] All five witnesses stated *1251 that they had never been contacted by defense counsel or by a defense investigator before Broadnax’s trial.
Whetstone testified that he worked the third shift, from 10:00 p.m. to 6:00 a.m., at the work-release facility the night of the murders, April 25, 1996. Whetstone said that for the third shift he normally arrived at the facility around 9:30 p.m. and conducted a head count of the inmates at the beginning of his shift. However, Whetstone said that on April 25, 1996, the night of the murders, he did not conduct his first head count until “12, 12 something that night.” (R1.29.)[16] Despite Rule 32 counsel’s repeated attempts to get Whetstone to change his testimony in this regard, Whetstone refused to do so. Whetstone also testified that he had seen Broadnax the night of the murders. Whetstone initially said that he had seen Broadnax at approximately 11:00 p.m., when Broadnax had asked to withdraw money from his prison account, but he later changed his testimony, stating that he had seen Broad-nax “between 11 and sometime ... I’m not sure.”[17] (R1.47.) Whetstone made clear, however, that Broadnax had asked to withdraw money just before Whetstone conducted the head count, which was, as noted, sometime after midnight.
Cumbie testified that he worked the second shift, from 2:00 p.m. to 10:00 p.m., the day of April 25, 1996. According to Cum-bie, he normally did his last head count of the shift around 9:00 p.m. The last head count he conducted that night, Cumbie said, initially did not “clear,” meaning an inmate was not accounted for, but when he conducted the head count again, it did “clear,” meaning that all inmates were accounted for. Cumbie testified, however, that he never saw Broadnax on April 25, 1996.
Bowden testified that he drove one of the work-release vans for the Alexander City work-release facility and that he remembered picking up Broadnax at Wel-born the night of the murders. Bowden said that he “probably” picked up Broad-nax “between 9 and 10” p.m. and that it took approximately 20 minutes to drive from Welborn to the work-release facility. (R1.84.) However, he admitted that if the officer log from the facility showed that Broadnax did not return to the facility in the work-release van until 11:50 p.m. that night, he “couldn’t argue with an officer.” (R1.102.) Smith testified that when he arrived back at the work-release facility from his job the night of April 25, 1996, he saw Broadnax crying in the office of one of *1252 the correctional officers. Smith said that he believed that he had seen Broadnax “around 11” p.m. or “sometime in there” because he normally worked second shift, from 2:00 p.m. to 10:00 p.m., and would arrive back at the facility by about 11:00 p.m. (R2.6.) We note, however, that both the officer log and the inmate log indicate that Smith did not arrive back at the work-release facility until 12:05 a.m.
In his affidavit, Stolz said that on April 25, 1996, he worked the second shift, from 2:00 p.m. until 10:00 p.m., at Welborn. According to Stolz, he remembered seeing Broadnax at Welborn at approximately 5:00 p.m. that day talking on the telephone. Stolz also stated that he knew both Mark Chastain and Kathy Chastain because both of them worked at Welborn and he had trained Kathy at Welborn and had dated Kathy’s sister. Stolz said that the night of the murders, he, not Broad-nax, was the person in the building when Mark Chastain set the alarm, and that it was he, and not Broadnax, who spoke with Mark and Kathy outside Welborn at approximately 10:45 p.m. that night before he returned to the work-release facility. Stolz also said that he was the only passenger on the work-release van that night. We note, however, that the officer log reflects that Stolz arrived back at the work-release facility at 10:45 p.m. the night of the murders, and the inmate log reflects that Stolz wrote down that he had arrived at the work-release facility at 10:45 p.m. Given the testimony, introduced by Broad-nax himself, that it took approximately 20 minutes to drive from Welborn to the work-release facility, it would have been impossible for Stolz to have been at Wel-born talking with Mark and Kathy Chas-tain and at the work-release facility at the same time, i.e., at 10:45 p.m.[18]
Broadnax did not call his trial counsel to testify at the 2011 hearing. Rather, he relied solely on the testimony they had provided at the hearing held on his first amended petition on May 23, 2005 (hereinafter “the 2005 hearing”). At the 2005 hearing, Brower, who had acted as lead defense counsel, testified that he had graduated from law school in 1985 and that, at the time he was appointed to represent Broadnax in 1996, approximately 90% of his practice was criminal defense. He had also participated in 18 capital-murder trials before he represented Broadnax. Brower testified that he began to investigate Broadnax’s case “[a]lmost immediately after the preliminary hearing.” (R32, R. 104.) Brower said that he spent a “lot” of hours on Broadnax’s case and that he had met with Broadnax a “substantial number” of times before trial, although he could not provide exact numbers. (R32, R. 138.) Brower stated that the district attorney’s office had an open-file policy regarding discovery and that he and cocoun-sel Bender received the bulk of discovery very quickly after being appointed. Brow-er also testified that he and Bender hired an investigator to help them investigate the case; specifically, they hired Steve Sexton, who Brower said was “known around the courthouse.” (R32, R. 105.) Brower also said that he believed that he and Bender asked Sexton to interview witnesses and specifically to go to the Alexander City work-release facility. However, Brower was never questioned about the specifics of the investigation Sexton actually conducted for the guilt phase of the trial, such as whom Sexton spoke to at the Alexander City work-release facility, or about the results of that investigation.
According to Brower, he had a good relationship with Broadnax, he liked *1253 Broadnax, and he believed Broadnax when Broadnax said that he had not committed the murders. Brower also said that Broadnax was very cooperative and told him and Bender his side of story. Specifically, Brower said that Broadnax told them that he was at Welborn the entire day and evening of the murders, although Broadnax was unable to provide a single alibi witness who had seen him at Welborn after approximately 6:30 p.m.[19] In addition, Brower testified that Broadnax had said that he was on the telephone with Wanda Broadnax, his sister-in-law, at the approximate time the bodies were left in Birmingham but that telephone records obtained by the State did not support the assertion and there was no other corroboration. As a result, Brower said, he and Bender could not present evidence that Broadnax was on the telephone at Welborn at approximately 9:00 p.m. the night of the murders without calling Broadnax himself to testify, which, in Brower’s opinion, would have been harmful to the defense.
Bender testified at the 2005 hearing that when he was appointed in 1996 to represent Broadnax on the capital-murder charges, he had been practicing law since 1993 and that his practice was 65-70% criminal defense. He also said that he had previously been involved in four or five capital-murder cases before representing Broadnax. Bender testified that he spent “significant time” investigating and preparing Broadnax’s case. (R32, R. 84.) Bender said that he and Brower retained Steve Sexton as an investigator to help them with the case and that they met with Sexton many times and communicated with Sexton “quite often.” (R32, R. 18.) According to Bender, Sexton’s investigation was not helpful, but not because “he didn’t do quality work or adequate work. It was just because there was just so little to what we could find relative to this particular crime.” (R32, R. 18.) Specifically, Bender said, because the crime occurred “in a confined setting,” the number of people involved “was restricted” and, thus, “[a] lot of the investigation was for the mitigation phase” and not for the guilt phase. (R32, R. 18-19.) Bender stated that he did not remember asking Sexton to contact Broadnax’s family members because, he said, Bender “was in constant communications with his family members.” (R32, R. 22.) Bender explained:
“I think my primary concern for Mr. Sexton was to talk to people in the Elyton Village area who may have seen any part of the crime, who may have known Mr. Broadnax when he was a child and to talk to people at the work release center or the Welborn Farms wood factory.”
(R32, R. 22-23.)
Bender testified that Broadnax always denied committing the murders and that, because Broadnax always maintained that “he didn’t know anything about it, what he could offer us or what he could help us with was limited.” (R32, R. 32.) Bender also said that Broadnax claimed that he was at Welborn during the time of the murders but that Broadnax was unable to provide counsel with anyone who had seen him at Welborn after 6:30 p.m. that night. As a result, there were no witnesses to subpoena on Broadnax’s behalf who could place Broadnax at Welborn at the critical times. Broadnax also told Bender that he had been on the telephone that evening with his brother, Larry. Bender said that *1254 he did investigate Broadnax’s claim that he was on the telephone because it “was at the heart of the case,” but that he could not find anything to support it. (R82, R. 86.) Indeed, according to Bender, Larry’s telephone records showed no calls from Welborn the night of the murders.
When asked what defense theory he and Brower pursued, Bender explained:
“Based on — you know, as a lawyer, you have to take obviously what your client tells you, take what the evidence is and sort of formulate a defense.... But Donald told us that he didn’t have anything to do with it. And I told him, Well, Donald, they found your work boots with both victims’ blood on them.’ And he explained that away. He said, T sold those boots to another inmate.’ All right. So right away if that’s correct and if that’s to be believed, that sort of explains why he wasn’t wearing his boots, which were his, used to be his, with blood on them. The victims’ blood was on his uniforms that they found. He told us that some of his uniforms had been stolen. And we checked with the work release director. And I think they did, in fact, indicate that he had made a report of some sort that some of his uniforms had been stolen. And so as far as I was concerned, that fit sort of in line with what he was saying; he didn’t do it. So it very well could have been someone else. ... But our defense was based on what he told us, which was he didn’t do it and what the evidence was or lack of evidence. And in this case, there wasn’t a lack of evidence. There was quite a bit of evidence in this case.
[[Image here]]
“... [H]e was in the work release center. So he should have been at certain places at certain times.
[[Image here]]
“The evidence though was that he wasn’t. The evidence was that he was up at Elyton Village at 11:00 o’clock at night hitchhiking a ride back down to the work release center when he should have been in the bed at 6:00 o’clock. And so even though he explained to us how and why it couldn’t have been him, the evidence in this matter couldn’t be changed; those facts that couldn’t be changed suggest that it had to be him.
[[Image here]]
“Well, what we tried to do is, there was a time, what we called a time line involved in this case. The time frame was from which there were — there was one man who saw him — there was nobody who actually saw him beat his wife to death and put her in the trunk. But there was one inmate who saw him in the car driving away from the work release — I mean, from Welborn Farms with a kid in the backseat. And obviously, on work release, he does not have any right to be driving. But there was an individual who saw him driving away. And then the evidence was that he drove, you know, came up to Elyton Village and that he hitchhiked back down to the work release center after all of this had happened. He got back, I think it was like 10:30 or 11:00 o’clock at night, unexplained. And there’s no reason why an inmate on work release should not be reporting back to his work site, I mean, the camp site at a specific time. They pick them up in vans at a specific time and deliver them at a specific time. So there was no reason why he shouldn’t have been there when he should have. He got back at 10:30, 11:00 o’clock at night which was way beyond the time frame that he should have been. And we couldn’t explain that away. You know, as a lawyer, you can explain some things away. That we couldn’t explain away. And there were *1255 people and records that indicate he got back there that night.”
(RB2, R. 51-55.)
In denying this claim in its order, the circuit court made three findings. First, the court made a general finding that because Broadnax had failed to call Brower or Bender to testify about this claim at the 2011 hearing, the silent record required a presumption that counsel’s actions were reasonable and, thus, that Broadnax had necessarily failed to prove this claim.[20] We agree.
As noted, although both Brower and Bender testified at the 2005 hearing on Broadnax’s first amended petition, neither were recalled to testify at the 2011 hearing on Broadnax’s second amended petition. This is important because Broadnax’s specific claim that Brower and Bender were ineffective for not adequately investigating and presenting evidence showing that Broadnax was at the work-release facility at 9:00 p.m. the night of the murders was not raised in Broadnax’s original petition or first amended petition — it was raised for the first time in Broadnax’s second amended petition, filed three years after the first hearing at which Brower and Bender testified. Although Broadnax did raise a claim in his original petition and first amended petition that Brower and Bender were ineffective for allegedly not investigating and discovering that Wanda Broadnax, Broadnax’s sister-in-law, had spoken to Broadnax “during the times the crimes were committed” (R32, C. 202), that claim was based on Broadnax’s own statements, to police and to his attorneys, that the night of the murders at approximately 9:00 p.m., he had telephoned his brother, Larry Broadnax, from Welbom. At no point did Broadnax argue in his original or first amended petition that Bender and Brower did not properly investigate the possibility that he was at the work-release facility at the time of the murders. Because this specific claim was not raised before Brower and Bender testified, they obviously were never specifically questioned about this claim.
It is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim, especially when the claim is based on specific actions, or inactions, of counsel that occurred outside the record. Indeed, “trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.” Rylander v. State, 101 S.W.3d 107, 111 (Tex.Crim.App.2003). This is so because it is presumed that counsel acted reasonably:
“The presumption impacts on the burden of proof and continues throughout the case, not dropping out just because some conflicting evidence is introduced. ‘Counsel’s competence ... is presumed, and the [petitioner] must rebut this presumption by proving that his attorney’s representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.’ Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986) (emphasis added) (citations omitted). An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption. *1256 Therefore, ‘where the record is incomplete or unclear about [counsels actions, we will presume that he did what he should have done, and that he exei'-cised reasonable professional judgment.’ Williams [v. Head,,] 185 F.3d [1223,] 1228 [ (11th Cir.1999) ]; see also Waters [v. Thomas,] 46 F.3d [1506,] 1516 [ (11th Cir.1995) ] (en banc) (noting that even though testimony at habeas evidentiary hearing was ambiguous, acts at trial indicate that counsel exercised sound professional judgment).”
Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000). “ ‘If the record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.’ ” Dunaway v. State, [Ms. CR-06-0996, December 18, 2009] - So.3d -, - (Ala.Crim.App.2009) (quoting Howard v. State, 239 S.W.3d 359, 367 (Tex.App.2007)).
In this case, neither Bender nor Brower was ever questioned about whether he had investigated the possibility of an alibi defense based on Broadnax’s being at the work-release facility at 9:00 p.m. the night of the murders, much less about why he did not pursue that defense, as opposed to the alibi defense that counsel did pursue, i.e., that Broadnax was at Welborn at 9:00 p.m. the night of the murders. Because the record is ambiguous as to the basis of Brower and Bender’s decision in this regard, we must presume that they exercised reasonable professional judgment. See Whitson v. State, 109 So.3d 665 (Ala.Crim.App.2012) (Rule 32 petitioner failed to prove that appellate counsel was ineffective where, although , petitioner called appellate counsel to testify at hearing, petitioner did not question appellate counsel about the ineffective-assistance claims raised in the petition). Thus, the circuit court correctly found that Broad-nax, by failing to question his attorneys about this specific claim, failed to overcome the presumption that counsel acted reasonably.[21]
Second, the circuit court found that Broadnax had failed to prove that his counsel’s performance was deficient. The court explained:
“As demonstrated by his statement given the morning after the murder and by his statements to trial counsel, Broadnax initially claimed that his alibi was that he was at the Welborn Forest Products facility from the beginning of his shift until approximately 10:45 p.m. that evening. Yet the claims in his Second Amended Petition are based on a theory that he returned to the Alexander City Work Release facility at 9:00 p.m.3 This new alibi theory is inconsistent with what Broadnax told trial coun *1257 sel. As the Supreme Court held in Strickland:
“ ‘The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.... And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable.’
“Strickland, 466 U.S. 668, 691 (emphasis added). Trial counsel performed a reasonable investigation baséd upon the information supplied by their client. The Court finds that Broadnax has failed to show deficient performance. Thus, this claim is denied.
[[Image here]]
“ 3Broadnax’s claim is based upon the inmate sign-in log from the Alexander City Work Release facility, which was admitted into evidence at the evidentia-ry hearing. The log is intended to document the time at which inmates checked out from the facility and cheeked back in. Broadnax’s entry in the log indicates a return time of ‘9:00.’ However, the testimony at the evidentiary hearing did not establish that inmates were monitored during sign-in.”
(C. 62-63.) These findings are supported by the record.
As noted previously, Broadnax gave two statements to police, and testimony regarding both statements was presented at trial. In his statements, Broadnax said that Jan had brought him dinner at Welborn the night of the murders and that she had left Welborn at approximately 8:20 p.m. He also said that he was at Welborn the entire day and evening of the murders and that he had telephoned his brother, Larry, from Welborn at approximately 9:00 p.m. When questioned specifically about the bloody boots and bloody Wel-born work uniform belonging to him that were found in the work-release facility, Broadnax stated that he had sold the boots to another inmate, although he could not identify the inmate, approximately a year earlier, and that the uniform had been stolen about two months earlier. Broad-nax also said that he had reported the theft of his uniform to the company who made and rented the uniforms to Welborn.
However, the State presented testimony at trial that no report of a stolen uniform had been made to the uniform company; it introduced into evidence at trial telephone records indicating that no telephone call had been made to Broadnax’s brother’s house from Welborn the night of April 25, 1996; and it established that the bodies of Jan and DeAngelo had been left in Birmingham, an hour and a half drive from Welborn, sometime between 8:20 p.m. and 8:55 p.m., thus making it impossible for Jan to have been at Welborn until 8:20 p.m. as Broadnax said in his statements. Accordingly, the State’s evidence clearly established that Broadnax had lied to the police in his statements at least three times.
Broadnax now argues, essentially, that his trial counsel should have investigated and presented evidence to the jury that Broadnax had lied to the police a fourth time — when he had said that he was at Welborn until 10:45 p.m. the night of *1258 the murders.[22] “[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.” Strickland, 466 U.S. at 691, 104 S.Ct. 2052. An attorney’s decision regarding investigation depends “critically” on information received from his or her client. Id. at 691, 104 S.Ct. 2052. In this case, neither Brower nor Bender had any reason whatsoever to think that an investigation into the possibility that Broadnax was somewhere other than Welborn at 9:00 p.m. the night of the murders was necessary. Broadnax told the police, and both Brower and Bender, that he was at Welborn at 9:00 p.m. the night of the murders, not at the work-release facility. “Trial counsel’s performance cannot be deemed ineffective for failing to locate alibi witnesses whose existence was not brought to his attention.” Adkins v. State, 280 Ga. 761, 762, 632 S.E.2d 650, 653 (2006). See also Davis v. State, 9 So.3d 539 (Ala.Crim.App.2008).
More importantly, even if counsel had some basis for possibly thinking that Broadnax had lied to them and to the police and may have, in fact, been at the work-release facility at 9:00 p.m., given that it was clear that Broadnax had lied to the police regarding other things, we cannot say that any decision to forgo attempting to further impugn their client’s credibility by presenting additional evidence of Broadnax’s lying to the police was unreasonable. See, e.g., Traylor v. State, 466 So.2d 185, 189 (Ala.Crim.App.1985) (Rule 32 petitioner’s claim that counsel was ineffective for not calling to testify a witness who could have provided an alibi was mer-itless where alibi witness’s testimony would have contradicted petitioner’s own testimony at trial). Therefore, the circuit court correctly found that Broadnax failed to prove that his counsel’s performance in this regard was deficient.
Third, the circuit court found that Broadnax had failed to prove that he was prejudiced by counsel’s conduct:
“The evidence and testimony offered at the evidentiary hearing failed to establish that there was any credible evidence to support Broadnax’s claim that he returned to the Alexander City Work Release facility at 9:00 p.m. Broadnax did not present testimony from a single witness who testified that he saw Broadnax at the facility at 9:00 p.m. The only witness whose testimony conflicted with the State’s theory at trial was Donald Bowden. Bowden testified that he picked Broadnax up at Welborn between 9:00 and 10:00 p.m.
“However, Bowden’s testimony is contradicted by the documentary evidence admitted at the evidentiary hearing. The work release officer’s log shows that Bowden made only one trip between 9:00 and 10:00 p.m. On that trip he left the center with three inmates at 9:00 p.m., picked up Roger Stolz at Welborn, and returned to the center with Stolz and R. Williams at 10:45 p.m. The log indicates that Bowden left the center again at 11:15 p.m., and returned with Broadnax and a ‘J. Samuels’ at 11:50 p.m.
*1259 “Moreover, the inmate sign-in sheet corroborates the officer’s log. Both Roger Stolz and R. Williams signed in at 10:45, consistent "with the time that the officer’s log shows Bowden returning with both men. Likewise, a ‘Jeppie’ or ‘Jessie’ Samuel signed in at 11:50, consistent with the officer’s log entry showing the return of ‘J. Samuels’ at 11:50 p.m. The only inconsistent entry is Broadnax’s. The Court heard evidence that the inmate sign-in log was not closely monitored and infers, as the jury surely would have, that when Broadnax returned to the center at 11:50 p.m. he simply wrote down ‘9:00.’ Considering the evidence and testimony, the Court finds that Donald Bowden’s testimony was not credible. Further, the Court finds that his testimony did not raise a reasonable probability that the result of Broadnax’s trial would have been different had it been presented by trial counsel. Consequently, this claim is denied.”
(C. 63-64; citations omitted.) Again, these findings are supported by the record.
Broadnax failed to prove that he was at the work-release facility at 9:00 p.m. the night of the murders. Despite Broadnax’s attempts in his brief on appeal to characterize the testimony of the “witnesses at the Rule 32 hearing” as “indicating that Mr. Broadnax was at the Alexander City Work Release Center at a time which would have made it impossible for him to have committed a murder in Birmingham” (Broadnax’s brief, at 28-29), none of the testimony presented by those witnesses, as summarized above, indicated that anyone saw Broadnax at the work-release facility at 9:00 p.m. on that night. Cumbie specifically testified that he never saw Broadax at all on April 25, 1996. Whetstone’s testimony established that he did not see Broadnax the night of April 25, 1996, until midnight or after. Although Smith testified that he thought he had seen Broadnax when he first arrived back at the work-release facility around 11 p.m. or shortly after, both the inmate log and the officer log reflect that Smith did not arrive back at the work-release facility until after midnight the night of the murders. Similarly, although Bowden testified that he picked up Broadnax at Welborn between 9:00 p.m. and 10:00 p.m., the officer log, which Bowden said he would not disagree with, reflects that Bowden did not even leave the work-release facility to pick up Broadnax until after 11:00 p.m. and that he did not arrive back at the facility with Broadnax until 11:50 p.m.
We also note that Broadnax’s heavy reliance on the inmate log as evidence that he was at the work-release facility at 9:00 p.m. is misplaced. Broadnax argues repeatedly on appeal that if he was not at the work-release facility at 9:00 p.m. as written on the inmate log, then none of the head counts conducted at the facility after that time would have “cleared,” i.e., he would have been unaccounted for. However, this argument is clearly wrong based on the testimony presented by Broadnax himself at the 2011 hearing. If Broadnax had returned to the facility at 11:50 p.m., as he had told the police and as he had told his trial attorneys, and as the officer log clearly shows, and he then simply wrote down, when he arrived at 11:50 p.m., that he had arrived at 9:00 p.m., this would not, in any way, have affected any head count conducted at or about 9:00 p.m. because at 9:00 p.m., the inmate log would not have had Broadnax’s signature or the time “9:00” written on it. Based on the testimony at the Rule 32 hearing, it is very clear that a head count conducted at 9:00 p.m. or shortly thereafter would have shown Broadnax to be absent from the facility at that time, but when the officers compared that count to the inmate log, as *1260 it appealed at 9:00 p.m., they would have seen that Broadnax had left the facility early that morning to go to work (because the log would have had his signature and the time he left) and had not yet signed back in and, therefore, they would have concluded that Broadnax was accounted for, i.e., still at work, and the head count would have “cleared.” A much more reasonable interpretation of, and likely explanation for, the inmate log is that Broadnax arrived at the facility at 11:50 p.m. but simply lied when he wrote down 9:00 p.m. in an effort to cover up his involvement in the murders.
In other words, the testimony and evidence at the 2011 hearing established that Broadnax did not arrive at the work-release facility until almost midnight the night of the murders, giving Broadnax ample time to have committed the murders, to have dumped the bodies in Birmingham, and to have traveled back to Alexander City. Clearly then, Broadnax failed to prove by a preponderance of the evidence that he was, in fact, at the work-release center “at a time which would have made it impossible for him to have committed a murder in Birmingham” as he alleges. (Broadnax’s brief, at 28-29.) Because Broadnax failed to prove that he was actually at the work-release facility at 9:00 p.m. the night of the murders, we conclude, as did the circuit court, that he failed to prove that he was prejudiced by counsel’s not pursuing an obviously fruitless investigation. See, e.g., James v. State, 61 So.3d 357, 367 (Ala.Crim.App.2010) (Rule 32 petitioner failed to prove claim that counsel was ineffective for not investigating his assertion that he was out of town the day before the murder to undermine the testimony of a State’s witness that he was outside the victim’s apartment with a gun the day before the murder where petitioner failed to present evidence at the Rule 32 hearing that he was, in fact, out of town the day before the murder).
For these reasons, the circuit court properly denied this claim of ineffective assistance of counsel.
B.
Broadnax also argues on appeal, as he did in his second amended petition, that his trial counsel were ineffective for not seeking a psychological evaluation of him for purposes of mitigation.[23] He maintains that had counsel obtained such an evaluation, “they would have learned about the history of mental illness in Mr. Broadnax’s family, the closed head trauma he suffered due to a car accident when he was a teenager, the trauma from the sexual abuse he suffered when he was younger, as well as his deficits in intellectual and executive functioning.” (Broadnax’s brief, at 42.) *1261 He also asserts that a proper evaluation and the background investigation that a psychologist would have conducted would have revealed his “psychological history including his victimization, rape, physical assaults, sexual assaults, traumatic exposure ' to violence, and physical trauma.” (Broadnax’s brief, at 46.) All this evidence, Broadnax concludes, would have been powerful mitigating evidence at the penalty phase of his trial.
Before addressing the merits of this claim, we make two observations regarding the limitations on our review. First, in his second amended petition, Broadnax raised a very broad claim that his “counsel were ineffective during the penalty phase of trial.” (C. 337.) He then divided this broad claim into several subclaims. See, e.g., Washington v. State, 95 So.3d 26, 58 (Ala.Crim.App.2012), and Coral v. State, 900 So.2d 1274, 1284 (Ala.Crim.App.2004), overruled on other grounds by Ex parte Jenkins, 972 So.2d 159 (Ala.2005) (both recognizing that a claim of ineffective assistance of counsel is a general claim that often consists of subcategories or sub-claims and that each subcategory or sub-claim is considered an “independent claim”). Those subclaims included counsel’s alleged failure to investigate possible mitigation witnesses, counsel’s alleged failure “to obtain vital records” (C. 356), counsel’s alleged failure to object to erroneous jury instructions, counsel’s alleged failure to retain “a professional social worker” (C. 366), and counsel’s alleged failure to seek a psychological evaluation of Broadnax. In his brief on appeal, Broadnax pursues only the very narrow subclaim that his counsel were ineffective for not seeking a psychological evaluation of him. Therefore, our review is confined to that limited issue.
Second, we note that much of Broad-nax’s argument on appeal is based on information that was never introduced into evidence. As explained in Part II of this opinion, at the 2011 hearing, Broadnax attempted to present hearsay evidence, through the testimony - of Dr. Kenneth Benedict, regarding various events that 'allegedly had occurred in his childhood— such as the car accident, the rape, and the physical assaults referenced above — as well as about the alleged history of mental illness in his family. The circuit court refused to allow this hearsay evidence,[24] but permitted Broadnax to make a proffer of the hearsay evidence Dr. Benedict would have testified to had he been allowed. As already explained, the circuit court properly refused to consider inadmissible hearsay evidence at a Rule 32 hearing. Therefore, in reviewing this claim, we consider only the evidence that was properly admitted at the Rule 32 hearings.
As noted above, at the 2005 hearing, both Brower and Bender testified. With *1262 respect to mitigation, Brower said that he spoke with Broadnax as well as several members of Broadnax’s family, although he could not remember exactly whom he had spoken to, and that he had also personally “met with a number of family members” regarding mitigation. (R32, R. 111.) According to Brower, Broadnax provided no names of people who could possibly offer mitigation evidence, other than family members, and he received more information regarding Broadnax’s history from Broadnax’s eldest sister, Dorothy McKinstry, than from Broadnax himself. Brower stated that there was “not a lot,of mitigation evidence present.” (R32, R. 142.)
Brower testified that he did not seek a psychological evaluation of Broadnax because he did not believe, based on his interactions with Broadnax, that such an evaluation was necessary. Specifically, Brower said that “Mr. Broadnax did not strike me as being someone who needed a psychological evaluation at the time. And it’s always been my practice not to file motions such as a psychological evaluation unless I can support them with some artic-ulable reason.” (R32, R. 109.) Brower said that he had no reason to believe that a psychological evaluation would have been helpful, especially given that he truly believed that Broadnax was innocent. Brow-er also said that, even after the jury returned a guilty verdict after the guilt phase of the trial (which, he said, was a shock to him) he “still didn’t think that a psychological evaluation of Mr. Broadnax was warranted.” (R32, R. 113.)
Bender testified that he did “quite a bit” of mitigation investigation, but could find little mitigating evidence. (R32, R. 38.) As a result, only Broadnax’s sister, Dorothy, was called to testify as a mitigation witness. Bender stated that he prepared Dorothy for her testimony and that he and Brower “discussed her testimony with her before she went on the, before she went on the stand in the mitigation phase.” (R32, R. 135.)
Bender said that he went to Welborn and personally spoke “to those individuals down there,” but that all he discovered was that Broadnax was “just the average guy working in their facility” and that there was “nothing different or special about him.” (R32, R. 67.) Bender also testified that he spoke with Broadnax’s family members, including Broadnax’s two sisters, brother-in-law, and mother, “quite often” about mitigation. (R32, R. 39.) Bender also personally went to Elyton Village, where Broadnax had grown up, and spoke with as many people as he could as part of the mitigation investigation, but the people there simply “couldn’t remember” because Broadnax had been in prison, and away from Elyton Village, for almost 20 years. (R32, R. 40.) Indeed, Bender said that the only person he found who actually remembered Broadnax from Elyton Village was Vince Cunningham, the Birmingham police detective who investigated the murders of Jan and DeAngelo and who testified for the State at Broadnax’s trial.
Bender also testified that he explained to Broadnax the purpose of mitigation, explained the type of evidence that could be presented as mitigation, and gave Broadnax “ideas about what I was looking for as far as mitigation.” (R32, R. 33.) Indeed, he said “that’s what most of those visits were about.” (R32, R. 91.) Bender said that Broadnax clearly understood the concept of mitigation because “[hje’s a bright guy,” but was unable to provide Bender with any possible mitigating evidence. (R32, R. 91.) In fact, Bender said that even though Broadnax’s “parents and family told me that he was abused as a child,” Broadnax denied any such abuse, claiming that he had gotten into trouble a *1263 lot and “was just sort of a tough kid,” so the family “had to sort of be tough on him.” (R32, R. 92.) In addition, according to Bender, Broadnax’s family said that when he was growing up Broadax was “normal for the area” and that only after his father died did Broadnax “sort of g[et] out of control” by getting involved in criminal activity and eventually committing murder and going to prison. (R32, R. 36.) Bender said that he spoke with both Broadnax and his family members about this time in Broadnax’s life, before he went to prison, and even specifically asked Broadnax’s mother about any “health issues that he may have had” (R32, R. 50) but that neither “[h]e nor his family members ever told me anything about any kind of medical history that he’s had, any issues with drugs. They never told me about him being hit by a car.... [T]his is the first I’m hearing it.” (R32, R. 36.) Bender also testified that a suicide attempt in Broadnax’s past would “certainly” have resulted in his seeking a psychological evaluation of Broadnax, but that neither Broad-nax nor any member of his family told Bender that Broadnax had attempted suicide. (R32, R. 49.) Indeed, Bender said that, despite speaking with Dorothy McKinstry numerous times by telephone, Dorothy did not even mention to him before trial that Broadnax had lived with her for a year; Dorothy said only that Broad-nax had visited her in the summers and on special occasions.
When questioned about the decision not to seek a psychological evaluation of Broadnax, Bender explained:
“My basis, and Mr. Brower and I discussed this, was this: Obviously, once you meet your client, you have a chance to talk to him — him or her — see them on an occasion or two. And if there are things about the person’s demeanor, if there are things about the person’s conversation, if there are things about the persons’s behavior that would suggest to you that they’re not stable, then obviously you want to have them evaluated. It was just the opposite with Mr. Broad-nax.
[[Image here]]
“Mr. Broadnax was, in my opinion, in having dealt with, up to that point, having dealt with a lot of people who were in prison and who had committed crimes, he was a bright person. He was very fluent in his conversation. He was eloquent to a degree. He had — his handwriting was magnificent. He explained — those things that he explained to us, he explained them to me in really sort of, a good sort of common sense. He had ideas. As I explained the facts to him as we knew them, he had ideas to sort of explain why these things couldn’t be, why this couldn’t be this way. And so there was absolutely nothing about him, his demeanor, his conversation, his behavior, his hygiene. You know, hygiene is one of those things you can normally look at and tell whether a person has mental or emotional issues. He had none of those things. So there was no reason, in my opinion, to have him evaluated. The fact that he was charged with this really horrendous crime is not a basis just to have him evaluated, especially when he tells you he didn’t have anything to do with it. And to be honest with you, I believed him.”
(R32, R. 29-31.) Bender also described Broadnax as “[w]ell spoken” and “mild mannered” and said that Broadnax “could write” and that he “conversed well.” (R32, R. 97.) He further said that Broadnax was very cooperative, “as cooperative as any individual I probably ever represented before that and even since that.” (R32, R. 32.) He also said that Broadnax was *1264 clearly capable both mentally and emotionally to assist in his defense.
At the 2011 hearing, Dr. Kenneth Benedict, a psychologist specializing in neuro-psychology, testified that he began evaluating Broadnax in 2006. He met with Broadnax seven times, spoke with Broad-nax’s two sisters, his brother-in-law, and his mother, reviewed medical records, school records, and records from Broad-nax’s first murder trial in the 1970s, and considered information from investigators. Dr. Benedict stated that it is essential in any psychological evaluation to ’ consider information from collateral sources. Dr. Benedict also conducted a battery of intelligence, achievement, and neuropsychological tests. Dr. Benedict said that when he first met with Broadnax, he believed that Broadnax was experiencing an acute anxiety attack, but that after he helped Broad-nax manage his anxiety, Broadnax was cordial and cooperative.
Dr. Benedict said that Broadnax was not mentally retarded or even intellectually impaired and that his IQ score was “well above” the mentally retarded range, in the average to low average range. (R2.57.) Dr. Benedict said that Broadnax read at a third-grade level and that the speed at which he read was at a first-grade level. Dr. Benedict also said that Broadnax performed significantly better on visual-based or motor-based tests than he did on language-based or verbal-based tests and that Broadnax’s visual memory was even above average.
According to Dr. Benedict, the difference between Broadnax’s performance on visual-based tests and verbal-based tests indicated- that there “were some definite anomalies in his cognitive functioning,” such as a developmental disability or learning disability or possibly “some type of acquired injury to the brain.” (R2.58-59.) In addition, Dr. Benedict stated that Broadnax had difficulty remembering words, had difficulty with his “fine motor skills” and “reaction times,” and had difficulty “making decisions under novel problem-solving conditions.” (R2.59-60.) Broadnax also, according to Dr. Benedict, had “great difficulties transitioning without confusion and considerable help from others.” (R2.79.) Dr. Benedict admitted, however, that he was never informed that Broadnax had successfully been on work-release for three years before he committed the murders.
As a result of his evaluation and testing, Dr. Benedict concluded that Broadnax had “significant cognitive problems that are not explainable by mental retardation or delirious state.” (R2.69.) Dr. Benedict diagnosed Broadnax with a cognitive disorder, not otherwise specified, receptive-expressive language disorder, reading disorder, and disorder of written expression. However, Dr. Benedict admitted that Broadnax met only “part of the criteria” for a learning disorder and a cognitive disorder. (R2.69.)
In its order, the circuit court found that Broadnax had failed to prove either that his counsel’s decision not to seek a psychological evaluation of him was deficient or that counsel’s decision prejudiced Broad-nax. The court made the following findings of fact:
“The decision not to seek a psychological evaluation was reasonably based on trial counsel’s experience and on the fact that Broadnax did not display any indications of mental illness. Similarly, in Cochran v. State, 548 So.2d 1062, 1073 (Ala.Cr.App., 1989), overruled on other grounds, Ex parte Rhone, 900 So.2d 455 (Ala.2004) the Court of Criminal Appeals held as follows:
“ ‘Cochran’s defense counsel did not request a mental evaluation because there was no reasonable indication *1265 that such an evaluation would have been beneficial to Cochran’s defense at trial or that it would have supplied mitigating evidence at sentencing. A tactical decision had been made to emphasize the weakness of the State’s case.’
“Cochran, 548 So.2d at 1073; see also Bush v. Singletary, 988 F.2d 1082, 1091-1092 (11th Cir.1998) (counsel acted within the ‘wide range of reasonable professional judgment’ in deciding not to have petitioner examined by a psychologist or to investigate psychological mitigation). Broadnax has failed to show that trial counsel did not act within the wide range of reasonable professional judgment when they determined that a psychological evaluation was not necessary.
“Because Broadnax failed to show deficient performance, it is not necessary for the Court to consider whether he has demonstrated prejudice. However, the Court finds that Broadnax has also failed to demonstrate prejudice.
“To support his claim that he was prejudiced by the absence of psychological testimony, Broadnax offered the testimony of Dr. Kenneth Benedict, a psychologist practicing in North Carolina. Dr. Benedict testified regarding a number of tests he administered to Broad-nax, including an T.Q.’ test that showed Broadnax to be in the average to low average intelligence range. Dr. Benedict opined that Broadnax suffered from several psychological problems: Cognitive Disorder Not Otherwise Specified, Expressive Language Disorder, Reading Disorder, and Disorder of Written Expression.
“The State offered evidence of four aggravating circumstances at the penalty phase and the jury in this case unanimously recommended the death penalty. There is no reasonable probability that testimony that Broadnax suffers from ‘Cognitive Disorder Not Otherwise Specified’ and language disorders would have led to a different result in this case. Similarly, the Court finds that the test results testified to by Dr. Benedict do not give rise to a reasonable probability that the result of his trial would have been different had trial counsel presented them. As such, Broadnax has failed to demonstrate either deficient performance or prejudice as required by Strickland. Therefore, this claim is denied.”
(C. 79-81.)[25] These findings are supported by the record.
Counsel is not per se ineffective for not seeking a psychological evaluation of a client. And this is not a case, as Broadnax claims, where counsel made the decision not to seek an evaluation after no investigation. Broadnax’s reliance on Ferrell v. Hall, 640 F.3d 1199 (11th Cir.2011), and Blanco v. Singletary, 943 F.2d 1477 (11th Cir.1991), is misplaced. In both Ferrell and Blanco, counsel was found to be ineffective for failing to pursue an investigation of the petitioner’s mental health and to seek a mental evaluation. However, both Ferrell and Blanco are examples of counsel egregiously overlooking obvious mental-health problems of their clients.
*1266 In Ferrell, the petitioner manifested obvious mental problems, including blank, glazed looks; extreme religious beliefs; hearing voices from God; and exhibiting strange and inappropriate demeanor and behavior at trial, such as laughing and smiling inappropriately. In addition, the petitioner’s mother had a history of mental illness, and most tellingly, “during the trial itself, [the petitioner] had a seizure, causing him to fall onto the floor, shake and speak gibberish.” 640 F.3d at 1228. In the face of such direct evidence of mental instability, the United States Court of Appeals for the Eleventh Circuit found that trial counsel was ineffective, even though counsel had had the petitioner evaluated, where counsel limited the evaluation solely to whether the petitioner was mentally retarded and whether he had the ability to waive his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and counsel did not seek an evaluation to determine the existence of any other mental defects.
In Blanco, the petitioner also manifested obvious signs of mental impairment, including being uncommunicative and unresponsive, being “easily angered,” appearing depressed and morose, and being irrational. 943 F.2d at 1502. Yet counsel in that case conducted no mitigation investigation at all and even admitted at the conclusion of the guilt phase of the trial that he was unprepared for the penalty phase and, thus, was found to be ineffective.
The circumstances of this case are in stark contrast with those in Ferrell and Blanco. In this case, Broadnax exhibited no signs of mental instability. To the contrary, counsel indicated that Broadnax was intelligent, well-spoken, and very cooperative. Indeed, Broadnax had “an answer for everything,” so to speak, in that he proffered to counsel reasonable and logical explanations for each piece of evidence against him. In addition, counsel here, unlike counsel in Blanco, conducted a mitigation investigation, speaking extensively and repeatedly with Broadnax himself as well as with several members of Broad-nax’s family, and searching the area where Broadnax grew up. However, neither the discussions nor the search resulted in any “red flags” suggesting that Broadnax was mentally impaired. Rather, according to counsel’s testimony, his discussions with Broadnax and his family produced nothing fruitful with respect to mitigation, but indicated that Broadnax had had no health issues or serious problems in his childhood, and that he was simply an average kid who got in trouble a lot and got out of control after his father died.[26] Simply put, counsel knew nothing at the time that would have led a reasonable attorney to believe that a psychological evaluation would have been beneficial.
Therefore, we agree with the circuit court that Broadnax failed to prove that his counsel’s decision not to seek a psychological evaluation constituted deficient performance. See, e.g., Cochran v. State, 548 So.2d 1062, 1072-74 (Ala.Crim.App.1989) *1267 (holding that postconviction petitioner had failed to prove counsel was ineffective for not seeking a mental evaluation of him for purposes of mitigation), overruled on other grounds by Ex parte Rhone, 900 So.2d 455 (Ala.2004); Horsley v. State, 527 So.2d 1355, 1362 (Ala.Crim.App.1988) (holding that failure to seek psychiatric assistance did not render counsel’s assistance ineffective where counsel had no reason to suspect that the accused suffered from a mental deficiency); Mayes v. Gibson, 210 F.3d 1284, 1289 n. 3 (10th Cir.2000) (holding that counsel was not ineffective for not requesting a mental evaluation where there was nothing to indicate to a reasonable attorney that the petitioner’s mental condition “was a potentially mitigating factor”); Williams v. Head, 185 F.3d 1223, 1239 (11th Cir.1999) (holding that counsel was not ineffective for failing to pursue mental-health investigation and request a mental evaluation where counsel had no problems communicating with the petitioner; found the petitioner to be intelligent, attentive, cooperative, polite, and interested in what was happening; and found that petitioner asked intelligent questions and responded intelligently to counsel’s questions); Smith v. Gibson, 197 F.3d 454, 462-63 (10th Cir.1999) (holding that counsel was not ineffective for failing to request a mental evaluation where counsel saw nothing suggesting that petitioner had mental deficits); Baldwin v. Johnson, 152 F.3d 1304, 1314-15 (11th Cir.1998) (holding that counsel was not ineffective for failing to request a mental evaluation where counsel had no problems communicating with the petitioner and petitioner did not say or do anything that indicated mental problems); Thompson v. Cain, 161 F.3d 802, 813 (5th Cir.1998) (holding that counsel was not ineffective for not requesting a mental evaluation where petitioner’s “mental stability was never in question”); and Bush v. Singletary, 988 F.2d 1082, 1091-92 (11th Cir.1993) (holding that counsel was not ineffective for failing to request a mental evaluation where counsel had no problems communicating with the petitioner, petitioner did not say or do anything that indicated mental problems, petitioner appeared to be intelligent, and counsel discussed what he knew about petitioner with a psychiatrist who indicated that he could not assist in the defense).
Furthermore, as explained above, “ ‘[i]n a challenge to the imposition of a death sentence, the prejudice prong of the Strickland inquiry focuses on whether “the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.”’” Daniels v. State, 650 So.2d 544, 568 (Ala. Crim.App.1994) (quoting Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir.1992)). As the circuit court noted, at trial the State proved, and the trial court found, the existence of four aggravating circumstances: (1) that the murders were committed by a person under a sentence of imprisonment, see § 13A-5-49(1), Ala.Code 1975; (2) that Broadnax had previously been convicted of a felony involving the use or threat of violence to a person, see § 13A-5^49(2), Ala.Code 1975; (3) that the murders were committed during the course of a kidnapping, see § 13A-5-49(4), Ala.Code 1975; and (4) that the murders were especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. We have thoroughly reviewed the record from Broadnax’s direct appeal, and we agree with the circuit court that even if evidence had been presented to the jury that Broadnax had a cognitive disorder, not otherwise specified, a receptive-expressive language disorder, a reading disorder, and a disorder of written expression, such evidence would not have altered the balance of aggravating and mitigating circumstances in this case. *1268 Therefore, the circuit court also correctly-found that Broadnax failed to prove that he was prejudiced by his counsel’s decision not to have him evaluated.
For these reasons, the circuit court properly denied this claim of ineffective assistance of counsel.
IV.
In his original, first amended, and second amended petitions, Broadnax also raised numerous additional claims. However, he does not pursue in his brief on appeal any of those other claims raised in his petitions. Therefore, those claims are deemed abandoned and will not be considered by this Court. See Brownlee v. State, 666 So.2d 91, 98 (Ala.Crim.App.1995) (“We will not review issues not listed and argued in brief.”).
Based on the foregoing, the judgment of the circuit court denying Broadnax’s Rule 32 petition is affirmed.
APPLICATION FOR REHEARING OVERRULED; OPINION OF DECEMBER 14, 2012, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
WINDOM, P.J., and WELCH, BURKE, and JOINER, JJ., concur.

. This Court may take judicial notice of our own records, and we do so in this case. See Nettles v. State, 731 So.2d 626, 629 (Ala.Crim.App.1998).

. Baker said that it was still daylight when he saw Broadnax driving the car, although he did not know the exact time.

. Baker also testified that Broadnax was shaking and sweating and appeared nervous and that Broadnax said that his wife, Jan, was at Russell Hospital in Alexander City.

. Chastain testified that he left Broadnax at Welborn, but stopped at a Krystal fast-food restaurant on his way home to telephone the work-release center to have the work-release van pick up Broadnax.

. There was no evidence at trial indicating that the piece of wood found in the trunk was, in fact, the murder weapon.

. No DNA testing was performed on the bloodstains found on the boots.

. Rule 32.2(c) was amended effective August 1, 2002, to reduce the limitations period for filing a Rule 32 petition from two years to one year. Because Broadnax’s case became final between August 1, 2001, and July 31, 2002, Broadnax had until August 1, 2003, to file his petition. See Court Comment of January 27, 2004, to Amendment to Rule 32.2 Effective August 1, 2002.

. Citations to the record from Broadnax's direct appeal will be to. "DA” followed by the appropriate page number or numbers. Citations to the record from Broadnax’s appeal from the denial of his first amended Rule 32 petition will be to "R32” followed by the appropriate page number or numbers.

. Broadnax’s argument in his initial brief on appeal is based solely on the premise that Dr. *1242 Benedict's testimony regarding the substance of statements made to him by Broadnax and Broadnax’s family members is, in fact, hearsay. (Broadnax’s brief, at 50 (stating that "[t]here is no dispute that hearsay evidence is admissible in the penalty phase of a capital trial”) and at 52 (arguing that the "Court’s decision to exclude hearsay testimony denied Mr. Broadnax a full and fair hearing”).) For the first time in his reply brief, Broadnax argues that Dr. Benedict’s testimony should have been admitted because, he says, it was not offered for the truth of the matter asserted and, therefore, was not hearsay. However, it is a "well-established principle of appellate review that we will not consider an issue not raised in an appellant’s initial brief, but raised only in its reply brief.” Brown v. St. Vincent's Hosp., 899 So.2d 227, 234 (Ala.2004). ”[N]ew issues may not be raised for the first time in a reply brief.” McCall v. State, 565 So.2d 1163, 1167 (Ala.Crim.App.1990). "As a general rule, issues raised for the first time in a reply brief are not properly subject to appellate review.” Ex parte Powell, 796 So.2d 434, 436 (Ala.2001). "[A]n appellant may not raise a new issue for the first time in a reply brief.” Woods v. State, 845 So.2d 843, 846 (Ala.Crim.App.2002). Although Broadnax did argue to the circuit court that Dr. Benedict's testimony was not hearsay, because the first time Broadnax makes this specific argument on appeal is in his reply brief, it is considered a "new issue” raised for the first time in a reply brief and is not properly before this Court for review. Therefore, for purposes of this opinion, this Court considers the testimony regarding the substance of statements made to Dr. Benedict by Broadnax and Broadnax’s family members to be hearsay, as argued by Broadnax in his initial brief.

. The circuit court permitted Broadnax to make a proffer of the hearsay information Dr. Benedict would have testified to had he been allowed to testify.

. Under the circumstances in this case, the Fifth Amendment privilege against self-incrimination would not have been applicable to Broadnax’s postconviction-hearing testimony. See State v. Click, 768 So.2d 417 (Ala.Crim.App.1999).

. As part of this claim, Broadnax also argues that counsel did not adequately investigate and attack several other parts of the State's case against him. Broadnax essentially argues that counsel was required to conduct an exhaustive investigation into virtually every piece of circumstantial evidence the State had against him and that, when combined with a proper and adequate investigation into his allegedly having been at the work-release facility at 9:00 p.m. on the night of the murders, counsel would have been able to raise reasonable doubt in the minds of the jurors. (Broadnax’s reply brief, at 5: "counsel failed to allocate adequate time for an exhaustive factual investigation”). However, because the crux of Broadnax’s claim of counsel’s alleged failure to investigate is his assertion of alibi and, as explained below, Broadnax failed to prove that claim, we find it unnecessary to specifically address in this opinion Broad-nax's peripheral arguments. Suffice it to say, after thoroughly reviewing the record from Broadnax’s direct appeal, the record from Broadnax’s appeal from the denial of his first amended petition, and the record before this Court in this appeal, we have no trouble concluding that Broadnax’s extraneous arguments are meritless.

. Indeed, there was testimony that inmates could, and sometimes did, sign each other in and out of the facility.

. Testimony indicated that the inmates often referred to Welborn as the cabinet shop or C. shop.

.Broadnax also attempted to introduce into evidence four additional affidavits — from Jerry Lane, Johnny Baker, and Phillip Holsem-back, inmates formerly housed at the Alexander City work-release facility, and Ernest Ledger, a former inmate housed at the Alexander City work-release facility. The circuit court refused to accept these affidavits, and *1251 Broadnax does not challenge that ruling on appeal. Because these affidavits were not admitted into evidence, we do not consider them.

. The record reflects that there was a change in court reporters during the 2011 hearing. As a result, the transcript of the hearing is in three sections, and each section is paginated separately. Citations to the first section of the hearing will be to "Rl” followed by the appropriate page number or numbers, citations to the second section of the hearing will be to “R2” followed by the appropriate page number or numbers, and citations to the third section of the hearing will be to "R3” followed by the appropriate page number or numbers.

. As the State correctly points out in its brief to this Court, Whetstone consistently had difficulty stating the times that events had occurred, often equivocated and changed his testimony about those times, and in some cases stated times that were inconsistent with the documentary evidence. For example, Whetstone testified that he believed the facility was notified about the murders of Jan and DeAngelo at approximately 11:00 p.m. that night; however, the incident report prepared that night, which was introduced into evidence at the 2011 hearing, reflects that the facility was not notified of the murders until midnight.

. Because Stolz's testimony was introduced by affidavit, the State did not have the opportunity to question Stolz about this discrepancy.

. As noted above, Johnny Baker testified that he had seen Broadnax the night of the murders, driving Jan’s vehicle with DeAngelo in the backseat. Baker said that he did not know what time he saw Broadnax but that it was still daylight. The State's theory of the case was that Baker saw Broadnax at approximately 6:30 p.m.

. In its order, the court stated that Broadnax "did not call Brower [or] Bender ... to testify at the Rule 32 evidentiary hearing.” (C. 61.) Although at first blush, this may appear to indicate that neither Brower nor Bender ever testified in the postconviction proceedings, which is incorrect, when read in context of the court’s entire order, it is clear that the circuit court was simply referring here to Broadnax’s failure to recall Brower and Bender at the 2011 hearing.

. We note that Broadnax argues vigorously against this finding in his reply brief, stating that "Mr. Broadnax cannot be faulted for choosing not to have counsel testify twice about what they said well enough the first time.” (Broadnax’s reply brief, at 4.) However, later in his reply brief, Broadnax then relies on his own failure to call his attorneys to testify about this claim at the 2011 hearing as evidence that he proved that his counsel were ineffective. He argues that ”[c]ounsel offered no reason for failing to call any defense witness.” (Broadnax's reply brief, at 12.) Clearly, counsel never offered a reason for not calling any of the witnesses presented at the 2011 hearing as defense witnesses at trial only because Broadax failed to call counsel to testify at the 2011 hearing and to question counsel about those witnesses. Broad-nax cannot fail to question counsel about a specific claim of ineffective assistance and then rely on counsel’s failure to testify about that claim as proof that counsel was ineffective. That is akin to invited error and will not be permitted. See Fountain v. State, 586 So.2d 277, 282 (Ala.Crim.App.1991) ("A defendant cannot invite error by his conduct and later profit by the error.”).

. He also argues that "[n]either defense counsel asserted that this strategy turned on Mr. Broadnax's statement” and, thus, that counsel's decision not to pursue such an investigation cannot be considered sound trial strategy. (Broadnax’s brief, at 32.) However, contrary to Broadnax's contention, as can be seen from the above summary of their testimony, both Brower and Bender made it vety clear that their investigation and defense theory were based in large part on Broad-nax’s statements to police and on what Broadnax had told them.

. We note that, in his brief on appeal, Broadnax also argues that his counsel should have obtained a psychological evaluation of him for purposes of the guilt phase of the trial in order to establish that he "lacked the mental facility to plan a complex escapade that required pinpoint timing.” (Broadnax’s reply brief, at 23.) However, Broadnax did not raise a claim in his original petition, first amended petition, or second amended petition that his trial counsel were ineffective for not having a psychological evaluation performed for the guilt phase of the trial. The only claims in his petitions of ineffective assistance at the guilt phase relating to experts were that his counsel were ineffective for not hiring a "juristic psychologist" to assist in jury selection (C. 327) and for not hiring "an independent DNA expert.” (C. 328.) Therefore, Broadnax’s argument, raised for the first time on appeal, that his trial counsel were ineffective for not obtaining a psychological evaluation of him for purposes of the guilt phase of the trial is not properly before this Court and will not be considered. See Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997) ("An appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.”).

. We also note that what evidence Broadnax presented at the 2005 hearing did not support, but refuted, several of Broadnax’s' allegations about his childhood. For example, in his original petition, Broadnax alleged that, when he lived with his older sister, Dorothy McKinstry, in Michigan for a year when he was a teenager, his sister and brother-in-law physically abused him and starved him. He also alleged in his second amended petition that while living in Michigan he attempted to commit suicide. However, at the 2005 hearing, Dorothy testified that neither she nor her husband physically abused Broadnax and that he was well fed while he lived with them. She also said that Broadnax's alleged suicide attempt was not, in fact, a suicide attempt, but was an accidental overdose from a mixture of alcohol and pain medication Broadnax had stolen from her. Broadnax also alleged in his original petition and second amended petition that he was physically abused by his mother. However, at the 2005 hearing, Broadnax's younger sister, Annette McKin-stry, testified that, although Broadnax was punished with "whippings” with a switch or a belt whenever-he got into trouble, he was not punished excessively. (R32, R. 149.)

. The circuit court also noted in its order that it had excluded certain hearsay evidence offered through Dr. Benedict at the 2011 hearing but had nonetheless allowed Broad-nax to make a proffer of that excluded evidence. In its order, the circuit court made an alternative finding, considering the proffered evidence, and still found that Broadnax had failed to prove prejudice. Because, as already explained, the circuit court properly excluded the hearsay evidence from the 2011 hearing, we find it unnecessary to address the court’s alternative finding.

. Although Broadnax presented testimony from several family members at the 2005 hearing regarding his childhood, as explained in note 24, supra, that evidence actually contradicted several of the allegations he had made in his petitions, and it certainly did not indicate that Broadnax had any mental-health issues. Moreover, counsel’s testimony establishes that very little of that evidence was ever provided to counsel. See, e.g., Williams v. Head, 185 F.3d 1223, 1237 (11th Cir.1999) ("An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.”); and Murphy v. Sirmons, 497 F.Supp.2d 1257, 1270 (E.D.Okla.2007) ("[C]ounsel cannot be deemed ineffective where potential witnesses, including family members, change their stories after trial.”).